# EXHIBIT 7

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

CAMELBAK PRODUCTS, LLC,

             Plaintiff,

    vs.

ZAK DESIGNS, INC.,

           Defendant.

Case No.: 5:21-cv-05109-TLB

**JURY TRIAL DEMANDED**

**DECLARATION OF JIM GOLDMAN IN SUPPORT**
**OF PLAINTIFF CAMELBAK PRODUCTS, LLC'S CLAIM CONSTRUCTIONS**

    I, James Goldman declare and state as follows:

## I.    INTRODUCTION AND QUALIFICATIONS

    1.    My name is James Goldman, and I reside at 1000 Old Still Road, Greensboro, Georgia 30642.

    2.    I am an adult over the age of 18 and, unless indicated otherwise, I have personal knowledge of the facts set forth in this declaration, and if called as a witness I could and would testify competently thereto.

    3.    I have over 40 years of diverse professional experience in the liquid-packaging industry. In 1982, I joined the Coca-Cola Company as a Packaging Engineer developing the first plastic beverage closures produced by either injection molding or compression molding. I later became a Packaging Lab Manager, testing and qualifying all types of packaging, including plastic and glass containers. New containers developed during my tenure in the Packaging Lab included the NASA space can, refillable plastic bottles, synthetic corks, and plastic cans. I became Principal Package Development Engineer in 1994 and introduced the refillable polyethylene naphthalate ("PEN") plastic bottle for water in Germany; this was the first use of PEN for containers, a material easier to clean than the refillable polyethylene terephthalate

("PET") plastic beverage bottle.  I also served as a Global Subject Matter Expert for glass, in which I was responsible for all technical and operational aspects of the 43-Billion glass bottles sold by the Coca-Cola System annually.  Finally, in 2005, I became a Senior Manager, Supply Chain Optimization, with projects including designing and sourcing roto-molded plastic carts for Africa and analysis of self-manufacturing of injection molded preforms and blow molded water bottles. After retiring from Coca-Cola Company in 2010, I worked as a consultant for Global Innovation Professionals, LLC, and consulted for consumer product goods companies, glass container manufacturers, plastic bottle suppliers, ingredient suppliers, and various other entities on packaging/bottling issues. My CV/Resume is attached to this Declaration as Exhibit 1.

4.      I have served as an expert or consultant in 6 patent lawsuits, and as an expert or consultant in numerous other civil cases.

5.      I am being compensated at a rate of $275 per hour for my work on this engagement. My compensation is not affected by the outcome of this matter.

6.      I was retained to assist Plaintiff CamelBak Products, LLC ("CamelBak") in analyzing the meaning of certain terms from the claims of the patents asserted in this suit, namely U.S. Patent Nos. 9,463,911, 9,782,028, 9,820,595, 10,165,879, 10,542,833, and 10,676,255.

**A.      Educational Background**

7.      As explained more fully in Exhibit 1, I have a Bachelor of Mechanical Engineering from Georgia Institute of Technology and a Masters of Business Administration from Georgia State University.

**B.      Career History**

8.      As explained more fully in Exhibit 1, I have developed and introduced plastic closures, plastic bottles, and glass bottles for water, juice, and soft drinks.  I have worked with injection molding, compression molding, blow molding equipment, and roto-molding equipment. As a Machine Designer, I designed and drafted complex parts that were assembled into functioning machines.

DECLARATION OF JIM GOLDMAN IN SUPPORT
OF PLAINTIFF CAMELBAK PRODUCTS, LLC'S CLAIM CONSTRUCTIONS

**C.      Publications and Patents**

9.      My patents and publications are listed in Exhibit 1.

**D.      Other Relevant Qualifications**

10.      I am a Certified Packaging Professional by the Institute of Packaging Professionals.  As a consultant, I have experience in the baby bottle industry working in China and France and managing the introduction of a glass baby bottle to China including the manufacturing of bottle and nipple components in China and in France, and in the assembly plant preparing the assembled baby bottle for sale.   I have identified the root cause of leaks for both vacuum and pressurized containers.  Patent cases have included areas including sports bottles, baby bottles, liquid dispensing containers, and plastic water bottles.

**E.      Materials and Other Information Considered**

11.      CamelBak provided me with a copy of the following documents for my review as part of this analysis: The Patents and File Histories for the following Patents: 9,463,911, 9,782,028, 9,820,595, 10,165,879, 10,542,833, and 10,676,255; *Ex Parte* Reexamination documents for Patent 9,463,911; Petition for *Inter Partes* Review and accompanying documents for Patent 9,782,028; CamelBak's Proposed Terms for Construction; CamelBak's Disclosure of Asserted Claims and Infringement Contentions; CamelBak's PLR 4-2 Preliminary Disclosure of Claim Constructions; Defendant's Disclosure of Proposed Terms for Construction; Defendant's Disclosure of Proposed Claim Construction and Supporting Evidence; Defendant's Invalidity Contentions; selected definitions from the Merriam-Webster Dictionary and American Heritage Dictionary.

## II.      OPINION AS TO LEVEL OF ORDINARY SKILL

12.      As set forth in CamelBak's infringement contentions, I understand that the priority date for the '911 and '255 patents is April 11, 2005, and I understand that the priority date for the '028, '595, '879, and '833 patents is January 21, 2009. I believe that a person of ordinary skill in the art ("POSITA") in 2005 and in 2009 would have had a bachelor's degree in mechanical engineering, or an equivalent, and four years of water bottle design or other relevant

complex liquid-container design experience. A POSITA also would have had a working knowledge of injection molding, blow molding, compression molding, material properties, and assembly methods.

## III.   UNDERSTANDING OF CLAIM CONSTRUCTION

13.     I am not an attorney, but am familiar with patents through my work as an inventor and as an expert in patent cases.  I also have been instructed by counsel as to certain aspects of claim construction law, listed below.

14.     I understand that claim construction is a matter of law, and will therefore be decided by the Court. I understand that the relevant inquiry in claim construction is the question of how a POSITA would have understood the claim terms at the time of the invention, in light of the patent specification and prosecution history. I also understand that, unless the patent and its prosecution history provide a reason to depart from the plain meaning of the claim language, the words of the claim are presumed to take on the ordinary and customary meanings attributed to them by a POSITA.

15.     I understand that the specification, which includes the claims, is the single best guide as to the meaning of the claim terms.

16.     I understand that although extrinsic evidence, like dictionary definitions, may be considered by the Court, such evidence is generally of less significance than the patent and file history.

17.     I also understand that where a claim term is made up of commonly used words, each of which is used in common parlance and has no special meaning in the art or the patent, the Court need not construe the term and the words of the claim can be used.

18.     I understand that all claim terms are meaningful and that claim constructions that render other claim language redundant or surplusage are disfavored.

19.     I understand that the claims of a patent must particularly point out and distinctly claim the subject matter of the invention, which is known as the definiteness requirement.  I understand that this requirement is met if the claims (when read in light of the specification and

file history) inform, with reasonable certainty, those skilled in the art about the scope of the invention.

20.    I understand that claim language employing terms of degree or comparison is definite if it provides reasonable certainty to one of skill in the art when read in the context of the invention. For example, comparative terms such as "more," "less," "better," "stronger," etc. can be used to provide clarity when reading the claim language in the context of the invention.

21.    I understand that a claim term may be preceded by an indefinite article (e.g., "a" or "an") the first time the claim term is used in a claim, and subsequent references in the claims to the claim term may be proceeded by a definite article (e.g., "the" or "said"), in which case I understand that the first claim term proceeded by an indefinite article may provide antecedent basis for the subsequent references of the claim term. I understand that a claim term may lack antecedent basis where it is unclear as to what element the limitation was making reference.  I also understand, however, that lack of antecedent basis does not render a claim invalid for indefiniteness unless the claims, when read in light of the specification and file history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention. For example, I understand that antecedent basis can be found by implication and by the inherent characteristics of an antecedent.  For example, the phrase "an anode gel comprised of zinc" can provide antecedent basis for "said zinc anode" by implication, and because a "sphere" inherently has an outer surface, a diameter, a radius, and a volume, the phrase "a sphere" can provide antecedent basis for "the outer surface of said sphere," "the diameter," or "the volume".

22.    I understand that claims can be written in "functional language" (i.e., in a manner that invokes what is known as 35 U.S.C. 112(f) or Pre-AIA 35 U.S.C. 112(6)).  I understand that a claim limitation is presumed to invoke 35 U.S.C. 112(f)/(6) when it explicitly uses the term "means" or "step" and includes functional language; by contrast, I understand that a claim limitation that does not use the term "means" or "step" will trigger the rebuttable presumption that 35 U.S.C. 112(f)/(6) does not apply.

23.    I understand that the presumption that 35 U.S.C. 112(f)/(6) does not apply to a

– 5 –

claim limitation that does not use the term "means" is overcome only when the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function. The standard is whether the words of the claim are understood by a POSITA to have a sufficiently definite meaning as the name for structure.

24.　　I understand there are a number of terms that have been proposed for construction under 35 U.S.C. §112(f)/(6), for which I have been asked to identify the structure necessary to perform the stated function. For each of these terms, I believe that a person of ordinary skill in the art would find sufficient structural meaning in the claim language itself. Nevertheless, I was asked to identify corresponding structure from the specification, in the event the Court determines that 35 U.S.C. §112(f)/(6) applies.

## IV.　CLAIM CONSTRUCTION OPINIONS

25.　　I have been asked to provide my opinion regarding what a POSITA, having read the Patents-in-Suit and their prosecution history, would have understood certain claim terms of the Patents-in-Suit to mean. In my opinion, a POSITA would have understood the following claim terms of the Patents-in-Suit to have the meanings as described below.

26.　　In rendering my opinions regarding the meaning of each term as understood by a POSITA at the time of the inventions of the Patents-in-Suit, I have considered the terms in the context of the claims, the specification and the prosecution history of each Patent-in-suit. Additionally, and as appropriate, I have also considered the materials disclosed in Section E, above, including related *Inter Partes* Review and *Ex Parte* Reexamination proceedings and extrinsic evidence, including dictionary definitions.

27.　　I have also been asked to evaluate and opine on the constructions proposed by the Defendant in this case. In evaluating Defendant's proposed constructions I have considered the evidence cited by the Defendant in the chart it submitted during the claim construction process. As further explained, Defendant's constructions should be rejected because they are inconsistent with the language if the claims, unsupported by the specification, unnecessary, and/or confusing.

### A.  is biased/biases

28.    With respect to the terms "is biased/biases," appearing in the claims of the '028, '595, '879, and '833 patents, it is my opinion that a person of ordinary skill in the art would have understood these terms as they appear in the Patents-in-Suit to mean "tends to return to its default state, absent an external force."

29.    For example, I understand that claim 1 of the '028 patent recites "wherein the mouthpiece assembly is biased to the dispensing configuration." A POSITA, having read the claims of the '028, '595, '879, and '833 patents and their specification, would have understood that the mouthpiece assembly tends to return to its default state (e.g., the dispensing configuration), absent an external force. *See, e.g.*, '028 patent[1] at 1:49-52 ("In some examples, the mouthpiece assembly is biased toward the dispensing configuration and thus moves automatically under its bias upon release by the user-release mechanism." The '028 patent explains that the bias towards the dispensing configuration may be provided by the material from which mouthpiece assembly is constructed, such as a resiliently-deformable material made of silicone. *See, e.g.*, '028 patent at 5:52-65 ("Mouthpiece assemblies 18 according to the present disclosure are biased toward the dispensing configuration and therefore may be described as having a biasing mechanism 50. The bias of a mouthpiece assembly according to the present disclosure may be provided by the internal bias created by the material from which at least a portion of the mouthpiece assembly is constructed. For example, at least a portion of a mouthpiece assembly, such as crimping region 44, may be constructed of a resiliently deformable material. An illustrative, non-exclusive example of a suitable resiliently deformable material includes (but is not limited to) silicone.").

30.    The Defendant's proposed construction – "is pushed, or force is exerted on, in a particular direction"/ "pushes or exerts force in a particular direction" – is inconsistent with the '028 specification and appears to improperly limit the scope of the claim term to pushing or exerting a force, such as by a spring, which is only one embodiment of a bias. '028 patent at

---

[1] I understand that the '028, '595, '879, and '833 patents share a common specification. In this declaration, when referring to this common specification, I have referred to the specification of the '028 patent.

13:1-14 ("Biasing members 250 **may** be described as springs or leaf springs and may include arcuate projections, or tabs, that biased to the positions") (emphasis added)[2]. As I explained above, in other embodiments, bias may be provided via at least a portion of the mouthpiece assembly including a crimping region constructed of a resiliently-deformable material such as silicone. A bias also can be an internal tendency that does not necessarily push or exert any external force as it returns the biased structure to its default state.  Further, the Defendant's construction, when substituted into the claim language of the '028 patent where "is biased" or "biases" appears, would be inconsistent with other claim language. For example, claim 1 of '028 patent recites "wherein the mouthpiece assembly **is biased** to the dispensing configuration." However, if Defendant's proposed construction were to be substituted, the claim now would read as if the mouthpiece assembly is "pushed" rather than automatically returning to its default state (e.g., the dispensing configuration), without any external force.

**B.  rigid**

31.    With respect to the term "rigid," appearing in the claims of the '028, '595, '879, and '833 patents, it is my opinion that a person of ordinary skill in the art would have understood this term to have its plain and ordinary meaning.

32.    I understand that "rigid" appears in the claims in the context of the term "rigid collar member." For example, claim 1 of the '028 patent recites "wherein the mouthpiece assembly further includes a rigid collar member that is pivotally coupled to the base and which includes a crimping portion." Claim 10 of the '028 patent recites that "the rigid collar member engages and crimps the crimping region to restrict the flow of drink liquid through the liquid passage when the mouthpiece assembly is in the stowed configuration." Accordingly, in the context of the '028 claims, and applying the plain and ordinary meaning of "rigid," a POSITA would have understood that the collar member has sufficient rigidity, or stiffness, to engage and crimp the crimping region of the resiliently-deformable tube so as to restrict the flow of drink liquid through the liquid passage when the mouthpiece assembly is in the stowed configuration.

---

[2] Unless I indicate otherwise, all emphasis appearing in this declaration has been added.

33.     The '028 specification makes clear that polycarbonates, plastic, and metal are examples of materials that may be considered rigid. *See* '028 patent at 3:38-41 ("**Liquid containers** 12 may be (but are not required to be) **rigid** or at least semi-rigid and may include a bottom surface 26 such that a liquid container may be generally self-supporting, or free-standing"); '028 patent at 1:20-23 ("Conventionally, many individuals carry **drink bottles that contain water** or other potable beverages. These bottles are **typically formed from plastic or metal** and include a cap."); '028 patent at 3:27-34 ("An illustrative, non-exclusive example of a material that may be used to construct liquid containers 12 according to the present disclosure includes the TRITAN™ **copolyester polymer** developed by Eastman Chemical Company. Other illustrative, non-exclusive examples of materials that may be suitable for construction of liquid containers according to the present disclosure include **polycarbonate** and **metal**, such as **aluminum**."). These examples are materials that a POSITA would have understood would typically have sufficient rigidity to engage and crimp the crimping region of the resiliently-deformable tube so as to restrict the flow of drink liquid through the liquid passage when the mouthpiece assembly is in the stowed configuration.

34.     In contrast to "rigid" materials such as polycarbonate and metal, the '028 specification also describes resiliently-deformable materials such as silicone. *See, e.g.*, '028 patent at 5:52-65 ("An illustrative, non-exclusive example of a suitable resiliently deformable material includes (but is not limited to) silicone."). Such a resiliently-deformable material typically would not have sufficient rigidity to engage and crimp the crimping region of the resiliently-deformable tube so as to restrict the flow of drink liquid through the liquid passage when the mouthpiece assembly is in the stowed configuration.

35.     Accordingly, it is my opinion that a POSITA would have understood the scope of the term "rigid" with reasonable particularity when read in light of the claims, specification, and file history. Moreover, I disagree with any argument that the term "rigid" is indefinite as failing to take into account how a POSITA would have understood the term in the context of the claims and specification, as I explain above.

– 9 –

### C.  mouthpiece assembly

36.    With respect to the term "mouthpiece assembly," appearing in the claims of the '028, '595, '879, and '833 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-Suit, in its plain and ordinary meaning.

37.    The term "mouthpiece assembly" is readily understood using its plain and ordinary meaning from the context of the claim language. For example, claim 1 of the '028 patent recites "a mouthpiece assembly extending through the through passage of the base and defining a liquid passage through which drink liquid from the liquid container may selectively flow, and further defining an inlet through which drink liquid in the internal compartment may enter the liquid passage and an outlet through which drink liquid from the internal compartment of the liquid container is selectively dispensed, wherein the mouthpiece assembly is configured to be selectively configured between a dispensing configuration, in which the liquid passage permits drink liquid to flow from the internal compartment at least into the liquid passage, and a stowed configuration, in which the liquid passage restricts the flow of drink liquid through the liquid passage, wherein the mouthpiece assembly is biased to the dispensing configuration, and wherein the mouthpiece assembly comprises: a mouthpiece portion that includes the outlet; a tube that defines at least a portion of the liquid passage for drink liquid to flow from the internal compartment to the mouthpiece portion, wherein the tube includes a crimping region constructed of a resiliently deformable material and is adapted to restrict the flow of drink liquid through the liquid passage when the mouthpiece assembly is in the stowed configuration."

38.    The term "mouthpiece assembly" also is readily understood using its plain and ordinary meaning from the context of the '028 specification. For example, the '028 specification describes that "[d]rink containers according to the present disclosure include a liquid container and a cap assembly with a **mouthpiece assembly** that is adapted to be selectively configured between a dispensing configuration, in which drink liquid may be selectively dispensed from the liquid container, and a stowed configuration, in which drink liquid is restricted from being

– 10 –

dispensed from the liquid container. In some examples, the **mouthpiece assembly** includes a tube portion, at least a portion of which defines a crimping region that is constructed of a resiliently deformable material and that is adapted to restrict the flow of drink liquid there through when the **mouthpiece assembly** is in the stowed configuration. Some examples of drink containers according to the present disclosure further include a user-release mechanism that is adapted to automatically, upon user actuation, release the **mouthpiece assembly** from the stowed configuration to the dispensing configuration. In some examples, the **mouthpiece assembly** is biased toward the dispensing configuration and thus moves automatically under its bias upon release by the user-release mechanism. In some examples, the **mouthpiece assembly** includes a user-actuated mouthpiece, such as a bite-actuated mouthpiece, having an open position and a closed position. Such a mouthpiece may enable a user to selectively receive drink liquid from the liquid container via the **mouthpiece assembly** when the **mouthpiece assembly** is in the dispensing configuration and the user-actuated mouthpiece is in the open position." '028 patent at 1:33-60. Similarly, the Abstract of the '028 patent describes "[d]rink containers with **mouthpiece assemblies** having a dispensing configuration and a stowed configuration. A **mouthpiece assembly** defines a liquid passage through which drink liquid may be dispensed when the **mouthpiece assembly** is in the dispensing configuration and includes means for selectively restricting the flow of drink liquid through the liquid passage when the **mouthpiece assembly** is in the stowed configuration. In some examples, the means for selectively restricting the flow of drink liquid include a tube that at least partially defines the liquid passage and which includes a crimping region. The crimping region may be constructed of a resiliently and reversibly deformable material that is adapted to restrict the flow of drink liquid through the liquid passage when the **mouthpiece assembly** is in the stowed configuration. In some embodiments, the **mouthpiece assembly** includes a means for automatically releasing the **mouthpiece assembly** from its stowed configuration to a dispensing configuration." '028 Patent at Abstract.

      39.    The Defendant's proposed construction – "the group of parts or distinct sections

that are joined together to allow a user to suck drink liquid" – seeks to redefine what is already clear from the claim language and incorrectly focuses on the user being able to suck such liquid through a straw; however, a straw is not described as part of the mouthpiece assembly. *See, e.g.*, '028 patent at 10:19-33 ("Mouthpiece assembly 118 includes a mouthpiece portion 76 in the form of a bite-actuated mouthpiece 176, a tube 78, and an anchor portion"). While a mouthpiece assembly may allow a user to suck liquid through a straw, it does not necessarily do so, such as if a straw was not connected. Because the mouthpiece assembly does not allow sucking drink liquid absent a straw, Defendant's proposed construction cannot be correct.

### D. Seat

40.    With respect to the term "seat," appearing in the claims of the '028, '595, '879, and '833 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-Suit, to mean "surface of a part on which another sits or rests."

41.    This construction is consistent with the claims and specification. For example, as shown in Figures 5, 6, and 11, and as described in the '028 specification, "structure 80 may include one or more of a channel or depression 84 that defines a seat for, and that is adapted to engage and mate with, a corresponding one or more of a lip, flange, or other protrusion of the collar member, when present. Accordingly, when assembled, structure 80 may restrict relative movement between the mouthpiece portion and the collar member and/or may restrict lateral translation of the collar member relative to the mouthpiece portion." '028 patent at 9:4-12.

42.    The Defendant's proposed construction – "space in a channel or depression in the mouthpiece portion," improperly excludes embodiments from the specification, as discussed above.

### E. stowing region

43.    With respect to the term "stowing region," appearing in the claims of the '028, '595, and '879 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-Suit, in its plain and ordinary meaning, which

is just a region for stowing.

44.      For example, claim 6 of the '028 Patent recites that "the cap assembly further includes … **a pair of lateral guards that at least partially define a stowing region that receives at least a portion of the mouthpiece assembly** between the pair of lateral guards when the mouthpiece assembly is in the stowed configuration." Similarly, the '028 specification recites: "[c]ap assembly 114 of drink bottle 100 further includes a handle 202 that projects away from base 116 and that includes a pair of lateral guards 204 that at least partially define a stowing region 206. Stowing region 206 is sized and otherwise adapted to receive at least a portion of the mouthpiece assembly between the pair of lateral guards when the mouthpiece assembly is in the stowed configuration. In the non-exclusive example of drink bottle 100, stowing region 206 receives bite-actuated mouthpiece 176 and at least a portion of tube 78." '028 patent at 11:15-29.

45.      The Defendant's proposed construction – "the space on the cap assembly that is sized for storing at least a portion of the mouthpiece assembly" – seeks to deviate from the claim language when the claim language itself already would have been readily understood by a POSITA. It also substitutes "storing" for "stowing" and adds "space on," both of which are confusing, and is repetitive of claim language that appears elsewhere in the claim, rendering it redundant.

### F.  automatically

46.      With respect to the term "automatically," appearing in the claims of the '028, '595, and '879, patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-Suit, to mean "without additional human intervention."

47.      For example, claim 1 of the '028 patent recites: "a user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration." Likewise, claim 21 of the '028 patent recites: "a user release mechanism adapted to automatically release the mouthpiece assembly

from the stowed configuration to the dispensing configuration via the bias of the mouthpiece assembly." In the context of this claim, a POSITA would have understood that, following engagement of the user release mechanism to release the mouthpiece assembly from the stowed configuration to the dispensing configuration via the bias of the mouthpiece assembly, the mouthpiece would move via its bias from the stowed configuration to the dispensing configuration without additional human intervention. This understanding is confirmed by the '028 specification. *See, e.g.*, '028 patent at 1:47-60 ("Some examples of drink containers according to the present disclosure further include a user-release mechanism that is adapted to **automatically**, upon user actuation, release the mouthpiece assembly from the stowed configuration to the dispensing configuration. In some examples, the mouthpiece assembly is biased toward the dispensing configuration and thus moves **automatically** under its bias upon release by the user-release mechanism.").

48.    The Defendant's proposed construction – "without action by the user"- improperly seeks to exclude all human interaction, contrary to the claim language and specification. The specification also explains that, for example, the automatic movement of the mouthpiece assembly from the stowed configuration to the dispensing configuration occurs ***after*** an initial human interaction. '028 patent at 6:31-39 ("...a user release mechanism 60 that is adapted to automatically disengage the first and second catch structures from each other upon actuation of the user release mechanism..."). The human interaction is thus needed to trigger a specific configuration; however the movement of the mouthpiece assembly is still "automatic" (i.e., occurs without additional human international).  The Defendant's construction fails to take this former interaction into account.

### G.    the anchor portion is sized to restrict passage of the anchor portion through the through passage

49.    With respect to the term "the anchor portion is sized to restrict passage of the anchor portion through the through passage," appearing in the claims of the '028, '595, and '879, patents, it is my opinion that a person of ordinary skill in the art would have understood this term

as it appears in the Patents-in-Suit, in its plain and ordinary meaning.

50.    Consistent with the plain and ordinary meaning of the claim language, the '028 specification explains: "the mouthpiece assembly may include an anchor, or anchor portion, 86 that is adapted to prevent, **or at least restrict**, passing of the anchor portion through the through-passage of the base of the cap assembly. Anchor portion 86 may extend from tube 78 and/or may include a flange 88, at least a portion of which may be sized to prevent, **or at least restrict**, passing of the anchor portion through the through-passage of the base of the cap assembly." '028 patent at 9:29-42.

51.    The Defendant's proposed construction – "the anchor portion is sized such that at least a part of the anchor portion is too large to fit into the through-passage and no part of the anchor portion may pass into one end of the through-passage and out of the opposite end of the through-passage" – improperly limits the claim to only one of the embodiments disclosed on the specification.  In one embodiment, an anchor portion may completely prevent passage (as suggested by Defendant's construction).  But in the other embodiment discussed above, which would be excluded by Defendant's construction, the anchor portion only restricts but does not prevent the passage. '028 patent at 9:29-42 ("anchor portion 86 may extend from tube 78 and/or may include a flange 88, at least a portion of which may be sized to prevent, or at least restrict, passing of the anchor portion through the through-passage of the base of the cap assembly").

**H.  user engagement pad … which extends through the sidewall of the base of the cap assembly/ user engagement pad that extends through a wall of the cap assembly/user engagement pad extends through a wall of the cap assembly**

52.    With respect to the term "user engagement pad… which extends through the sidewall of the base of the cap assembly/user engagement pad that extends through a wall of the cap assembly/user engagement pad extends through a wall of the cap assembly," appearing in the claims of the '028, '595, and '833, patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-Suit, in its plain and ordinary meaning.

– 15 –

53.     For example, claim 3 of the '028 patent recites that "the user release mechanism further includes a user engagement pad that is coupled to the sliding member and which extends through the sidewall of the base of the cap assembly for selective engagement by a user." Claim 3 further recites that "the user release mechanism includes at least one biasing member that urges the sliding member and user engagement pad away from a position where the sliding member disengages the first and the second catch structures." Likewise, the '028 specification recites "Sliding member 238 includes a user engagement pad 240 and an actuator, such as may be implemented and/or described as a generally planar portion 242, that includes a pair of tabs 244 that slide within a pair of corresponding channels 246 that extend into lateral guards 204 of handle 202. Sliding member 238 is configured to slide relative to the base of the cap assembly upon user actuation of the user release mechanism 160 (i.e., upon user engagement and translation of the user engagement pad 240." '028 patent at 12:56-65.

54.     I understand that the Defendant proposes constructions for this term as follows: "user engagement pad… which extends from one side to the other side of an opening that is surrounded by the sidewall of the base of the cap assembly," /"user engagement pad that extends from one side to the other side of an opening that is surrounded by the wall of the cap assembly," / "user engagement pad extends from one side to the other side of an opening that is surrounded by the wall of the cap assembly." This proposed construction seeks to rewrite claim language that would have been readily understood by a POSITA according to its plain and ordinary meaning and instead introduces such requirements as "from one side to the other side" in each construction in lieu of "through," and limit the claim to require "an opening that is surrounded by the wall of the cap assembly," which does not appear in the claims.

I.     **release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration**

55.     With respect to the term "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration," appearing in the claim of the '833 patent, it is my opinion that a person of ordinary skill in the art would have understood this

term as it appears in the Patent-in-suit, in its plain and ordinary meaning.

56.     For example, claim 1 of the '028 patent recites "a user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration." Likewise, the '028 specification explains: "To permit the reconfiguring of the mouthpiece assembly from the stowed configuration to the dispensing configuration, cap assemblies 14 according to the present disclosure may (but are not required to) include a user release mechanism 60 that is adapted to automatically disengage the first and second catch structures from each other upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration. As schematically illustrated in FIGS. 1-4, the optional user release mechanism may therefore be tied to, or otherwise have a mechanical relationship with, the second catch structure of the base of the cap assembly. Additionally or alternatively, a user release mechanism according to the present disclosure may be tied to, or otherwise have a mechanical relationship with, the first catch structure of the mouthpiece assembly. Although schematically illustrated as part of the base of the cap assembly, a user release mechanism according to the present disclosure may also be part of, integral to, or otherwise disposed on, the mouthpiece assembly or the liquid container. Other configurations are also within the scope of the present disclosure." '028 patent at 6:31-52.

57.     Further, in view of the claim language and specification, it is my opinion that a person of ordinary skill in the art would have understood the scope of the term "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" with reasonable certainty.

58.     I understand that Defendant contends that this term is indefinite. I disagree, as a POSITA reviewing this term in light of the claim language and its specification would have understood the scope of this term with reasonable certainty.

**J.  slit**

59.     With respect to the term "slit" appearing in the claims of the '911 and '255 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

60.     For example, I understand that claim 7 of the '911 patent recites "wherein the dispensing face of the resilient mouthpiece **includes an opening** that extends through the dispensing face, **wherein the opening defines the dispensing outlet and is defined by a slit**, and wherein the resilient mouthpiece has **different outer dimensions transverse and parallel to the slit**." Likewise, as shown in Fig. 16 of the '911 patent, slit 88 includes an opening. *See* '911 patent[3] at 8:53-58.

61.     Further, it is my opinion that a person of ordinary skill in the art, reviewing the claims and specification, would have understood the scope of the term "slit" with reasonable particularity.

62.     I understand that Defendant proposes the construction – "a cut through the dispensing face of the mouthpiece that is long and narrow when the mouthpiece is in a closed configuration" – for the term "slit." This proposed construction would improperly limit the scope of the claim to only a cut, rather than to any other type of opening that is encompassed within the plain and ordinary meaning of "slit." For example, even Defendant's own dictionary defines slit as "a long narrow cut **or opening**." ZAK0048805. In my opinion, a POSITA would have understood that the plain and ordinary meaning of "slit," when read in the context of this patent, would encompass a long narrow opening, and I disagree with Defendant's proposed construction because it excludes from its scope openings formed by methods other than a "cut" and excludes any shape of the opening other than a "cut."

**K.  dispensing face**

63.     With respect to the term "dispensing face" appearing in the claims of the '911 and '255 patents, it is my opinion that a person of ordinary skill in the art would have understood this

---

[3] I understand that the '911 and '255 patents share a common specification. In this declaration, I will refer to the specification of the '911 patent.

term as it appears in the Patents-in-suit, in its plain and ordinary meaning and no additional construction is necessary. A POSITA would understand the plain and ordinary meaning to be "surface through which liquid is dispensed."

64.    For example, I understand that claim 1 of the '911 patent recites "a resilient mouthpiece removably mounted on the drink spout and having **a dispensing face**, which includes the dispensing outlet …" Further, I understand that claim 2 of the '911 patent recites that "**the dispensing face** of the resilient mouthpiece includes an opening that extends through the dispensing face, and wherein the opening defines the dispensing outlet."

65.    Likewise, I understand that the '911 specification explains that "[t]he illustrated example also demonstrates that the region of the mouthpiece distal the **dispensing face**, which may be referred to as the base, or distal, portion of the mouthpiece and which is generally indicated at 113 in FIGS. 10 and 12-15 may have (but is not required to have) a contoured configuration that does not extend at a constant distance from the dispensing face. In the illustrative, non-exclusive example shown in FIGS. 12 and 13, the base portion includes a pair of projecting regions 114 separated by a pair of concave regions 115, although this construction is not required and other irregular base configurations may be utilized without departing from the scope of the present disclosure." '911 patent at 9:1-13.

66.    Further, it is my opinion that a person of ordinary skill in the art, reviewing the claims and specification, would have understood the scope of the term "dispensing face" with reasonable certainty.

67.    The Defendants propose the construction – "end surface of the mouthpiece extending crosswise between opposed sidewalls of the mouthpiece" for the term "dispensing face." This construction is incorrect as the words "extending crosswise between opposed sidewalls of the mouthpiece" are not supported by the specifications of Patents '911 or '255, nor is the term "dispensing face" defined. ''028 patent at 9:46-58 *(... that extend along the sidewalls away from the dispensing face and which may assist in the mouthpiece deforming to its open configuration and/or returning to a sealed configuration).*

**L.  fluid conduit**

68.    With respect to the term "fluid conduit" appearing in the claims of the '911 and '255 patents, it is my opinion that the term should not be construed out of context. Instead, the full phrase "fluid conduit through which drink fluid may selectively flow from the fluid container and through the cap assembly to a user" should be construed.

69.    Further, to the extent the limited phrase "fluid conduit" is being construed, it should be afforded its plain and ordinary meaning, which a POSITA would understand to be "fluid-carrying structure."

70.    The Defendants propose the construction – "closed channel through which drink fluid may flow" for the term "fluid conduit." The Defendant's use of the word "channel" in their construction, as opposed to "conduit," which can include a channel, pipe or tube, improperly limits the claims.  If Defendant's construction is substituted into the claims, it results in redundancy ("closed channel through which drink fluid may flow through which drink fluid may selectively flow"), which is disfavored.

**M. fluid conduit through which drink fluid may selectively flow from the fluid container and through the cap assembly to a user**

71.    With respect to the term "fluid conduit through which drink fluid may selectively flow from the fluid container and through the cap assembly to a user" appearing in the claims of the '911 and '255 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

72.    For example, I understand that claim 1 of the '911 patent recites "**a fluid conduit** through which drink fluid may selectively flow from the fluid container and through the cap assembly to a user, wherein the fluid conduit includes an inlet through which drink fluid from the fluid container may enter **the fluid conduit**, and a dispensing outlet through which drink fluid in the fluid conduit may be dispensed from the cap assembly to a user," "a manual on/off valve having a closed configuration, in which the manual on/off valve obstructs **the fluid conduit** to restrict drink fluid from flowing between the inlet and the dispensing outlet, and an open

configuration, in which the manual on/off valve permits drink fluid to flow through **the fluid conduit** from the inlet to the dispensing outlet," "a drink spout that defines at least a portion of **the fluid conduit**," "wherein **the fluid conduit** includes a crimpable region that is adapted to be selectively crimped to restrict drink fluid from flowing there through to the mouthpiece."

73.    I understand that Defendant proposes the construction – "closed channel through which drink fluid may flow" for the term "fluid conduit." I disagree with this construction because it seeks to divorce "fluid conduit" from the longer claim language in which it appears and results in redundancy ("closed channel through which drink fluid may flow through which drink fluid may selectively flow"), which is disfavored.

**N.  in a fixed orientation**

74.    With respect to the term "in a fixed orientation" appearing in the claims of the '911 and '255 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

75.    For example, I understand that claim 10 of the '911 patent recites that "the cap assembly further includes a handle that projects in a fixed orientation from the cap assembly base."

76.    Further, it is my opinion that a person of ordinary skill in the art, reading the '911 claims, specification, and file history, would have understood the scope of the term "in a fixed orientation" with reasonable particularity.

77.    I understand that Defendant proposes the construction – "in a non-changing direction" for the term "in a fixed orientation." The Defendant's construction does not help to explain the meaning of the term "in a fixed orientation" which would have been readily understood to a POSITA to have its plain and ordinary meaning. Instead, Defendant's construction merely substitutes different words for the chosen claim language. Defendant's substituting of the word "direction" for "orientation" does not provide clarify but instead creates confusion, as an orientation can be fixed in multiple directions. For example, handles can have a fixed orientation and extent in non-fixed directions such as, for example, an L shape and/or any

– 21 –

other shape with non-fixed directions.

### O. air return assembly

78.    With respect to the term "air return assembly" appearing in the claims of the '911 patent, it is my opinion that the term should not be construed out of context. Instead, the full phrase "air return air return assembly adapted to selectively permit air from external the drink container to enter the internal compartment of the fluid container other than through the dispensing outlet of the resilient mouthpiece" should be considered, and it should be afforded its plain and ordinary meaning.

79.    For example, the '911 specification explains: "A schematic example of a drink bottle 10 according to the present disclosure that includes an air return assembly is shown in FIG. 9, with the air return assembly generally indicated at 160. Air return assembly 160 is adapted to permit air from external the drink bottle to enter the internal compartment 20 of fluid container 12 without having to pass through the drink bottle's mouthpiece 72 (or least the dispensing face 90 or opening 86 of the mouthpiece). It is within the scope of the present disclosure that the air return assembly may be implemented on the cap assembly, such as on base 70 of the cap assembly. It is also within the scope of the present disclosure that the air return assembly, when present, may be implemented on the fluid container and/or that the drink bottle may be formed without an air return assembly that is separate from the bite-actuated mouthpiece. It is also within the scope of the present disclosure that an air return valve may be integrally formed with the bite-actuated mouthpiece or that it may be separately formed from the mouthpiece. When separately formed from the mouthpiece, the air return assembly may be positioned in a spaced-apart relationship to the mouthpiece on the cap assembly, on a dispensing mount (or nozzle) 100, on the fluid container, etc." '911 patent at 12:63-13:18.

80.    I understand that Defendant proposes the construction –" a group of parts that are joined together to form a unit that is separate from the mouthpiece and through which air can pass from external the drink bottle to the internal compartment of the drink bottle"- for the term "air return assembly." This construction would exclude embodiments from the specification of

the '911 patent. For example, the specification of the '911 patent states that "it is within the scope of the present disclosure that an air return valve may be integrally formed with the bite-actuated mouthpiece or that it may be separately formed with the mouthpiece." '911 patent at 12:63-13:18. Further, the specification of the '911 patent states that "the air return assembly, may but is not required to, include at least one air return valve." '911 patent at 13:28-32.

**P.  air return assembly adapted to selectively permit air from external the drink container to enter the internal compartment of the fluid container other than through the dispensing outlet of the resilient mouthpiece**

81.   With respect to the term "air return assembly adapted to selectively permit air from external the drink container to enter the internal compartment of the fluid container other than through the dispensing outlet of the resilient mouthpiece" appearing in the claims of the '911 patent, as I explained above, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

**Q.  the resilient mouthpiece is more resilient than the drink spout**

82.   With respect to the term " the resilient mouthpiece is more resilient than the drink spout" appearing in the claims of the '911 patent, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

83.   For example, the specification of the '911 patent explains that that silicone is a resiliently-deformable material. '911 patent at 12:22-36 ("[A] suitable actuation mechanism for a static on/off valve 120 utilizes a fluid conduit having a foldable, collapsible, resiliently deformable, and/or crimpable region and suitable structure for selectively folding, flattening, resiliently deforming, and/or crimping that region of the fluid conduit to block, obstruct, or otherwise restrict the flow of drink fluid there through. This region may define a portion of the fluid conduit through which drink fluid may selectively flow from the inlet to the mouthpiece. An illustrative, non-exclusive example of a suitable material for such a portion of the fluid conduit is **silicone or another material that does not readily take a compression set and**

therefore may be repeatedly folded, flattened, crimped, and the like without leaking or otherwise being permanently deformed or failing."). In contrast, the '911 patent explains that other materials such as "[p]olycarbonate" are "typically … rigid, or stiff." '911 patent at 4:9-37. A POSITA would have understood that a mouthpiece formed of a resiliently-deformable material, such as silicone, would be more resilient that a drink spout formed of a rigid, or stiff, material, such as polycarbonate (i.e., that the more resilient mouthpiece would temporarily and substantially deform when impinged upon by the less resilient drink spout, which would not substantially deform).

84.    Further, it is my opinion that a person of ordinary skill in the art, reviewing the claims, specification, and file history, would have understood the scope of the term "the resilient mouthpiece is more resilient than the drink spout" with reasonable particularity.

85.    I understand that Defendant contends that this term is indefinite. I disagree, as explained above.

**R.  handle is secured to the cap assembly base in a position that obstructs removal of the pair of lateral projections from the sockets**

86.    With respect to the term "handle is secured to the cap assembly base in a position that obstructs removal of the pair of lateral projections from the sockets" appearing in the claims of the '911 Patent, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit in its plain and ordinary meaning.

87.    Further, it is my opinion that a person of ordinary skill in the art, reviewing the claims, specification, and file history, would have understood the scope of the term "handle is secured to the cap assembly base in a position that obstructs removal of the pair of lateral projections from the sockets" with reasonable certainty.

88.    I understand that Defendant proposes the construction –"handle is secured to the cap assembly in a position that requires removal of the handle for removal of the pair of lateral projections from the sockets" for the term "handle is secured to the cap assembly base in a position that obstructs removal of the pair of lateral projections from the sockets." I disagree with

this proposed construction. While a position of the handle that requires removal of the handle for removal of the pair of lateral projections from the sockets would obstruct removal, the claim language is not so limited, and Defendant's proposed construction would exclude other positions of the handle that obstruct removal of the pair of lateral projections. It also requires that the handle be removable, which is not in the claim language and improperly imports one embodiment from the specification into the claim.

### S. Handle

89.    With respect to the term "handle" appearing in the claims of the '911 and '255 Patents it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit in its plain and ordinary meaning.  A "handle" is a handle.

90.    I understand that Defendant proposes the construction – "a structure extending or projecting away from the drink container and configured for grasping by the hand" for the term "handle." I believe that this construction is too narrow and is contradicted by the specification of '911 and '255 patents. As the specification of the '911 patent explains, "for example, the body may include a handle, or passage, that extends into, or through the drink compartment." '911 patent at 4:51-5:4. As the handle may extend into or through the drink compartment, limiting a handle to a structure that extends or projects away from the drink container would be inconsistent with the specification. Therefore, it is not always the case that the handle would be a structure that extends or projects away from the drink container, and Defendant's proposed construction is too narrow.

### T. at least one biasing member that urges the sliding member and user engagement pad away from a position where the sliding member disengages the first and second catch structures

91.    With respect to the term "at least one biasing member that urges the sliding member and user engagement pad away from a position where the sliding member disengages the first and second catch structures," appearing in the claims of the '028 patent, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the

Patent-in-suit, in its plain and ordinary meaning.

92.    For example, I do not believe that this term should be construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The claim language does not use the term "means," so I understand that there is a rebuttable presumption that 35 U.S.C. § 112, ¶ 6 does not apply. Here, I do not believe that the presumption that 35 U.S.C. § 112, ¶ 6 does not apply is rebutted. For example, in view of the subject matter of the Patents-in-suit, directed to drink bottles or containers comprising simple mechanical structures, as claimed, a POSITA would have understood the claimed "biasing member" to recite sufficient structure for performing the claimed function and to have a sufficiently definite meaning as the name for structure.

93.    Regardless, to the extent that this term is construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6, I believe that claimed function is "urging the sliding member and user engagement pad away from a position where the sliding member disengages the first and the second catch structures." The structure disclosed in the '911 specification for performing this function includes biasing member 250, including any spring and/or leaf spring, and including any structure that may include arcuate projections, or tabs that are biased to a position, and equivalents thereof. *See* '028 patent at Fig. 11, 13:1-14.

94.    I understand that Defendant has proposed a corresponding structure of "at least one spring or leaf spring and equivalents thereof." I disagree with this proposed corresponding structure because it excludes structure identified in the specification for performing the claimed function, as discussed above.

**U.    mouthpiece-securing structure that secures the mouthpiece portion to the rigid collar member and restricts relative movement between the mouthpiece portion and the rigid collar member**

95.    With respect to the term "mouthpiece-securing structure that secures the mouthpiece portion to the rigid collar member and restricts relative movement between the mouthpiece portion and the rigid collar member" appearing in the claims of the '595, '879, and '833 patents, it is my opinion that a person of ordinary skill in the art would have understood this

term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

96.    For example, I do not believe that this term should be construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The claim language does not use the term "means," so I understand that there is a rebuttable presumption that 35 U.S.C. § 112, ¶ 6 does not apply. Here, I do not believe that the presumption that 35 U.S.C. § 112, ¶ 6 does not apply is rebutted. For example, in view of the subject matter of the Patents-in-suit, directed to drink bottles or containers comprising simple mechanical structures, as claimed, a POSITA would have understood the claimed "mouthpiece-securing structure" to recite sufficient structure for performing the claimed function and to have a sufficiently definite meaning as the name for structure.

97.    Regardless, to the extent that this term is construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6, I believe that claimed function is "securing the mouthpiece portion to the rigid collar member and restricting relative movement between the mouthpiece portion and the rigid collar member." The structure disclosed in the '028 specification for performing this function includes structure 80, including any lip, flange, or other protrusion 82 and any channel or depression 84, and equivalents thereof. *See* '028 patent at Fig. 5, 8:63-9:16, 9:29-34, 13:40-52.

98.    I understand that Defendant has proposed a corresponding structure of "one or more of a lip, flange, or protrusion, or one or more of a channel or depression, and equivalents thereof." I disagree with this proposed corresponding structure because it does not explicitly include all structure identified in the specification for performing the claimed function, as discussed above.

**V.    a user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration**

99.    With respect to the term "a user release mechanism adapted to automatically

disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" appearing in the claims of the '028, '595, and '879 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

100.    For example, I do not believe that this term should be construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The claim language does not use the term "means," so I understand that there is a rebuttable presumption that 35 U.S.C. § 112, ¶ 6 does not apply. Here, I do not believe that the presumption that 35 U.S.C. § 112, ¶ 6 does not apply is rebutted. For example, in view of the subject matter of the Patents-in-suit, directed to drink bottles or containers comprising simple mechanical structures, as claimed, a POSITA would have understood the claimed "user release mechanism" to recite sufficient structure for performing the claimed function and to have a sufficiently definite meaning as the name for structure.

101.    Regardless, to the extent that this term is construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6, I believe that claimed function is "automatically disengaging the first and second catch structures upon actuation of the user release mechanism and thereby releasing the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration." The structure disclosed in the '028 specification for performing this function includes user release mechanism 60 and/or user release mechanism 160, including any structure with a mechanical relationship to the first and/or second catch structures, such as sliding member 238, and equivalents thereof. *See* '028 patent at Figs 1-4, 7, 9-10, 12, 13; 6:31-52, 11:15-19, 12:50-13:54, 14:55-60, 14:61-65, 19:31-36, 19:37-41.

102.    I understand that Defendant has asserted that this term is indefinite. Alternatively, I understand that Defendant has proposed a corresponding structure of "sliding member having a user engagement pad and actuator, and equivalents thereof." I disagree with this proposed corresponding structure because it does not explicitly include all structure identified in the specification for performing the claimed function, as discussed above. In addition, I disagree

– 28 –

with Defendant's contention that this term is indefinite. I understand that a means-plus-function term may be indefinite if the specification does not disclose any structure for performing the claimed function. However, as I explained above, the '028 specification discloses structure for performing the claimed function. Furthermore, Defendant's ability to propose corresponding structure is inconsistent with its assertion that the claim is indefinite.

### W. structure for securing the tube portion to the rigid collar member and restricting relative movement between the tube portion and the rigid collar member

103.    With respect to the term "structure for securing the tube portion to the rigid collar member and restricting relative movement between the tube portion and the rigid collar member" appearing in the claims of the '595 and '879 patents, it is my opinion that a person of ordinary skill in the art would have understood this term as it appears in the Patents-in-suit, in its plain and ordinary meaning.

104.    For example, I do not believe that this term should be construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6. The claim language does not use the term "means," so I understand that there is a rebuttable presumption that 35 U.S.C. § 112, ¶ 6 does not apply. Here, I do not believe that the presumption that 35 U.S.C. § 112, ¶ 6 does not apply is rebutted. For example, in view of the subject matter of the Patents-in-suit, directed to drink bottles or containers comprising simple mechanical structures, as claimed, a POSITA would have understood the claimed "structure" to recite sufficient structure for performing the claimed function and to have a sufficiently definite meaning as the name for structure.

105.    Regardless, to the extent that this term is construed as a means-plus-function term under 35 U.S.C. § 112, ¶ 6, I believe that claimed function is "securing the tube portion to the rigid collar member and restricting relative movement between the tube portion and the rigid collar member." The structure disclosed in the '028 specification for performing this function includes structure 80, including any lip, flange, or other protrusion 82 and any channel or depression 84, and equivalents thereof. *See* '028 patent at Fig. 5; 1:39-44, 8:28-31, 8:63-9:16.

– 29 –

106.    I understand that Defendant has asserted that this term is indefinite. I disagree with this proposed corresponding structure because, as discussed above, the specification identifies structure for performing the claimed function.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. This declaration is executed this 10th day of October, 2022.

JIM GOLDMAN

Dated:    October 10, 2022

DECLARATION OF JIM GOLDMAN IN SUPPORT
OF PLAINTIFF CAMELBAK PRODUCTS, LLC'S CLAIM CONSTRUCTIONS