# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**CAMELBAK PRODUCTS, LLC**                                                    **PLAINTIFF**

**v.**                              **CASE NO. 5:21-cv-05109-TLB**

**ZAK DESIGNS, INC.**                                                         **DEFENDANT**

<u>**EXPERT REPORT OF JOHN H. HAMILTON**</u>

## A. TABLE OF CONTENTS

A.   TABLE OF CONTENTS ................................................................................. 2

B.   BACKGROUND ......................................................................................... 3

C.   QUALIFICATIONS .................................................................................... 3

D.   MATERIALS CONSIDERED ...................................................................... 4

E.   PERSON OF ORDINARY SKILL IN THE ART............................................. 5

F.   APPLIED LEGAL STANDARDS ................................................................. 6

G.   OPINIONS REGARDING CERTAIN CLAIM TERMS AND PHRASES....................... 7

This written report is provided as required under Fed. R. Civ. P. 26(a)(2)(B) in connection with the case styled *CamelBak Products, LLC v. Zak Designs, Inc.*, which is pending in the United States District Court for the Western District of Arkansas as Case No. 5:21-cv-05109-TLB.

## B. BACKGROUND

1.      I have been retained as a technical expert to provide my independent opinions regarding the asserted patents at issue in this case.  My opinions and the bases and reasons for my opinions are provided in this report.

2.      My work in this matter is being compensated at a rate of $250 per hour for analysis and $325 per hour for deposition and trial.  My compensation is not dependent upon my testimony or the outcome of this litigation.

3.      I have been asked to give my opinions on whether certain claim terms and phrases in U.S. Patent No. 9,463,911 ('911 Patent), U.S. Patent No. 9,782,028 ('028 Patent), U.S. Patent No. 9,820,595 ('595 Patent), 10,165,879 ('879 Patent), U.S. Patent No. 10,542,833 ('833 Patent), and U.S. Patent No. 10,676,255 ('255 Patent) are definite or indefinite.

## C. QUALIFICATIONS

4.      I am currently an Instructor in the Mechanical Engineering Department at the University of Arkansas in Fayetteville, Arkansas.  I have worked as an Instructor at the University of Arkansas since 2002 and have taught a variety of mechanical engineering courses, including Engineering Design I, Machine Design,  Mechanics of Materials, and Materials Science.

5.      I received a Bachelor of Science degree in mechanical engineering from the University of Arkansas in 1990 and a Master of Science degree in mechanical engineering from the University of Arkansas in 1997.

6.      I am a licensed Professional Engineer in the State of Arkansas.

7.      I worked approximately four years for a plastics manufacturer as a manufacturing engineer and a plant engineer and have knowledge of plastics processing and assembly of plastic parts. I also have consulted over the last 24 years in litigation involving plastic processing machinery.

8.      My curriculum vitae is attached as Exhibit A.

9.      A list of cases in the previous four years in which I have given expert testimony, either in deposition or at trial, is attached as Exhibit B.

**D.  MATERIALS CONSIDERED**

10.      In forming my opinions provided in this report, I reviewed and considered the following materials:

a.      '911 Patent and its prosecution history;

b.      '028 Patent and its prosecution history;

c.      '595 Patent and its prosecution history;

d.      '879 Patent and its prosecution history;

e.      '833 Patent and its prosecution history;

f.      '255 Patent and its prosecution history;

g.      Zak's "Disclosure of Proposed Claim Constructions and Supporting Evidence Pursuant to N.D. Cal. Patent L.R. 4-2" and the extrinsic evidence cited by Zak for the claim terms and phrases on which I am opining;

4

h.      CamelBak's "Disclosure of Preliminary Claim Constructions and Supporting Evidence Pursuant to Patent Local Rule 4-2" and the extrinsic evidence cited by CamelBak for the claim terms and phrases on which I am opining; and

i.      the dictionary definition of the word "semi-rigid," which is attached as Exhibit C.

## E.  PERSON OF ORDINARY SKILL IN THE ART

11.      I have been informed that CamelBak contends that the '911 Patent and '255 Patent are entitled to a priority date of April 11, 2005.  I have been informed that CamelBak contends that the '028 Patent, '595 Patent, '879 Patent, and '833 Patent are entitled to a priority date of January 21, 2009.  I have not formed any opinions as to whether these priority dates are correct.

12.      I have been informed that a person of ordinary skill in the art is a hypothetical person who is presumed to have the skill and experience of an ordinary worker in the field at the time of the invention.

13.      In my opinion, a person of ordinary skill in the art in April 2005 and January 2009 would have had a degree in engineering or the equivalent and a year or more of experience in designing, prototyping, and/or manufacturing containers produced from thermoplastic resins, including injection molding and/or blow molding such containers from preforms.  Less work experience may be compensated by a higher level of education and vice versa.

14.      I was a person of ordinary skill in the art before April 2005 based on my education and industry work experience.

## F. APPLIED LEGAL STANDARDS

15.    I am not a lawyer, but I have been informed by counsel of the legal standards applicable to the issues that I have been asked to examine.

16.    I have been informed that the claims of a patent must be sufficiently definite that one skilled in the art can determine the bounds of the claimed invention.  In that regard, the claims must be precise enough to provide clear notice of what is claimed so as to prevent a zone of uncertainty for third parties.

17.    I have been informed that a patent claim is deemed "indefinite" if the claim, read in light of the patent's specification and prosecution history, fails to inform with reasonable certainty a person skilled in the art about the scope of the invention.

18.    I have been informed that a claim term or phrase is indefinite if the patent fails to provide an objective standard by which to define the scope of the claim term or phrase.

19.    I have been informed that a claim term or phrase is indefinite if it is subject to multiple plausible meanings to a person of ordinary skill in the art.

20.    I have been informed that the concept of "antecedent basis" is used in drafting patent claims in order to satisfy the definiteness requirement.  I understand that an indefinite article, such as "a" or "an", is used the first time a particular element in a patent claim is recited. Then, if that same element is referred to again in the patent claim, the element is preceded by "said" or "the."

21.    I have been informed that a claim term that lacks an antecedent basis may, but does not necessarily, render a claim indefinite.  I have been informed that a claim is indefinite when it contains words or phrases where the meaning is unclear, which may be the result of lack of antecedent basis.

6

## G.  OPINIONS REGARDING CERTAIN CLAIM TERMS AND PHRASES

### Claim Term: "Rigid"

22.     Claims 10 and 13 of the '028 Patent, claims 16, 22, 26, 28, and 32 of the '595 Patent, claims 1, 5, and 7-8 of the '879 Patent, and claims 1 and 4 of the '833 Patent recite a "rigid collar member."

23.     It is my opinion that the scope of the claim term "rigid" was not reasonably certain to a person of ordinary skill in the art in January 2009 or at any time since.

24.     From my review of the specifications and prosecution histories of the '028 Patent, '595 Patent, '879 Patent, and '833 Patent, it is my opinion that the specifications and prosecution histories do not provide an objective standard for determining the scope of the claim term "rigid."

25.     The specifications of the '028 Patent, '595 Patent, '879 Patent, and '833 Patent state: "In some embodiments, the collar member may be rigid or at least semi-rigid."  *See, e.g.,* '028 Patent at col. 7, lines 46-48.  Based on the distinction between "rigid" and "semi-rigid" in the specifications, I understand the meaning of "rigid" in the claims to exclude "semi-rigid."

26.     The specifications of the '028 Patent, '595 Patent, '879 Patent, and '833 Patent do not explain how to determine whether a collar member is rigid, semi-rigid, or other than rigid or semi-rigid.  There are no definitions in the specifications for "rigid" or "semi-rigid."  There also are not any examples in the specifications for how a collar member is made to be "rigid," such as by describing the materials used to make the collar, the size, or the geometry of the collar, all of which are things that would influence the rigidity of the collar.

27.     Based on my review of the specifications and prosecution histories, it is my opinion that there are no functional standards in the specifications or prosecution histories to use to determine when the collar member is rigid, semi-rigid, or other than rigid or semi-rigid.

28.     I am aware that CamelBak has provided dictionary definitions of the word "rigid" that include "very firm rather than pliant in composition or structure," "lacking or devoid of flexibility," and "hard" or "stiff."  I am also aware that the dictionary definition of the word "semi-rigid" is "rigid to some degree or in some parts." In engineering textbooks that I use, "rigid" objects are objects that do not deflect. Given that the specification identifies both "rigid" and "semi-rigid" in describing the relative rigidity of the collar member, there is no way to know what "rigid" means within the claim phrase.

29.     These dictionary definitions of "rigid" and "semi-rigid" do not make it clearer to a person of ordinary skill in the art how to determine when the collar member is rigid versus when the collar member is semi-rigid because the definitions of "rigid" are highly subjective and the dictionary definition of the word "semi-rigid" includes the word "rigid."

30.     Because the specifications and prosecution histories do not provide an objective standard for determining the scope of the claim term "rigid," it is my opinion that the scope of the claim term "rigid" was not reasonably certain to a person of ordinary skill in the art in January 2009 or at any time since.  Accordingly, the claims reciting the claim term "rigid collar member" are indefinite.

**Claim Phrase: "release the mouthpiece assembly to move via its bias<br>from the stowed configuration to the dispensing configuration"**

31.     Claim 1 of the '833 Patent recites: "the sliding member includes a user engagement pad that extends through a wall of the cap assembly for selective engagement by a user to urge the sliding member to move relative to the base of the cap assembly to release the

8

mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration."

32.     Based on my review of claim 1 of the '833 Patent, it is my opinion that "its bias" lacks antecedent basis because there is no earlier reference to the mouthpiece assembly having "a bias." In fact, there are no other uses of the word "bias" as a noun in the claim.

33.     Without antecedent basis, the meaning of the claim phrase "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" is not reasonably certain because it is unclear what is being referred to by the recitation of "its bias."

34.     There are two different claim phrases in claim 1 of the '833 Patent that relate to the mouthpiece assembly being biased to dispensing configuration that precede the claim phrase at issue. In these claim phrases, "biased" and "biases" are not used as nouns.

35.     First, claim 1 recites: "the mouthpiece assembly is biased to the dispensing configuration." '833 Patent at col. 21, lines 51-53. Second, claim 1 recites: "the crimping region [of the tube portion of the mouthpiece assembly] at least partially biases the mouthpiece assembly to the dispensing configuration." '833 Patent at col. 22, lines 1-3.

36.     The specification of the '833 Patent describes how the mouthpiece assembly is biased to the dispensing configuration as follows:

> Mouthpiece assemblies 18 according to the present disclosure are biased toward the dispensing configuration and therefore may be described as having a biasing mechanism 50. The bias of a mouthpiece assembly according to the present disclosure may be provided by the internal bias created by the material from which at least a portion of the mouthpiece assembly is constructed. For example, at least a portion of a mouthpiece assembly, such as crimping region 44, may be constructed of a resiliently deformable material. An illustrative, non-exclusive example of a suitable resiliently deformable material includes (but is not limited to) silicone. Additionally or alternatively, a biasing mechanism 50 may include at least one spring. Other configurations are also within the scope of the present disclosure.

'833 Patent at col. 5, line 66-col. 6, line 12.

37.    This description from the '833 Patent expressly states that the mouthpiece may be biased toward the dispensing configuration in at least three ways: (1) an internal bias created by the material from which the mouthpiece assembly is constructed; (2) an external bias that includes at least one spring; or (3) an internal bias and an external bias.

38.    From my review of the specification and prosecution history of the '833 Patent, I understand "the mouthpiece assembly is biased to the dispensing configuration" claim phrase to refer to the mouthpiece assembly having an internal bias, an external bias including at least one spring that biases the mouthpiece assembly, or both.  However, only the mouthpiece assembly having an internal bias created by the material from which the mouthpiece assembly is constructed is described in the specification as the mouthpiece assembly possessing a bias.

39.    From my review of the specification and prosecution history of the '833 Patent, I understand "the crimping region at least partially biases the mouthpiece assembly to the dispensing configuration" claim phrase to refer to an internal bias created by the material from which the crimping region is constructed.  I also understand this claim phrase to mean that the crimping region may or may not act alone to bias the mouthpiece assembly to the dispensing configuration, which is consistent with the specification.  In other words, more than one bias may be used to bias the mouthpiece assembly to the dispensing configuration.

40.    Because the specification expressly states that the mouthpiece assembly may be biased by more than one bias, the recitations in claim 1 of the '833 Patent of "the mouthpiece assembly is biased to the dispensing configuration" and "the crimping region at least partially biases the mouthpiece assembly to the dispensing configuration" makes it unclear what bias

10

(internal bias, external bias, either internal bias or external bias, or both internal bias and external bias) is being referred to by the recitation of "its bias."

41.    It therefore is my opinion that the scope of the claim term "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" was not reasonably certain to a person of ordinary skill in the art in January 2009 or at any time since and that claim 1 is indefinite as a result.

**Claim Phrase: "a user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly <u>to move via its bias from the stowed configuration to the dispensing configuration</u>"**

42.    Claim 1 of the '028 Patent, claims 14 and 26 of the '595 Patent, and claim 1 of the '879 Patent recite: "a user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration."

43.    Based on my review of claim 1 of the '028 Patent, claims 14 and 26 of the '595 Patent, and claim 1 of the '879 Patent, it is my opinion that "it bias" lacks antecedent basis because there is no earlier reference to the mouthpiece assembly having "a bias."  In fact, there are no other uses of the word "bias" as a noun in the claims.

44.    Without antecedent basis, the meaning of the claim phrase "a user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism and thereby release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" is not reasonably certain because it is unclear what is being referred to by the recitation of "its bias."

45.    There is one claim phrase in claim 1 of the '028 Patent, claims 14 and 26 of the '595 Patent, and claim 1 of the '879 Patent that relates to the mouthpiece assembly being biased to dispensing configuration that precedes the claim phrase at issue.  In this claim phrase, "biased" is not used as a noun.

46.    In particular, the claims recite: "the mouthpiece assembly is biased to the dispensing configuration."  *See, e.g.*, '028 Patent at col. 21, lines 45-46.

47.    The specifications of the '028 Patent, '595 Patent, and '879 Patent describe how the mouthpiece assembly is biased to the dispensing configuration as follows:

> Mouthpiece assemblies 18 according to the present disclosure are biased toward the dispensing configuration and therefore may be described as having a biasing mechanism 50. The bias of a mouthpiece assembly according to the present disclosure may be provided by the internal bias created by the material from which at least a portion of the mouthpiece assembly is constructed. For example, at least a portion of a mouthpiece assembly, such as crimping region 44, may be constructed of a resiliently deformable material. An illustrative, non-exclusive example of a suitable resiliently deformable material includes (but is not limited to) silicone. Additionally or alternatively, a biasing mechanism 50 may include at least one spring. Other configurations are also within the scope of the present disclosure.

*See, e.g.*, '028 Patent at col. 5, lines 52-65.

48.    This description from the '028 Patent, '595 Patent, and '879 Patent expressly states that the mouthpiece may be biased toward the dispensing configuration in at least three ways: (1) an internal bias created by the material from which the mouthpiece assembly is constructed; (2) an external bias that includes at least one spring; or (3) an internal bias and an external bias.

49.    From my review of the specifications and prosecution histories of the '028 Patent, '595 Patent, and '879 Patent, I understand "the mouthpiece assembly is biased to the dispensing configuration" claim phrase to refer to the mouthpiece assembly having an internal bias, an external bias including at least one spring that biases the mouthpiece assembly, or both.

However, only the mouthpiece assembly having an internal bias created by the material from which the mouthpiece assembly is constructed is described in the specification as the mouthpiece assembly possessing a bias.

50.    Because the specification of the '028 Patent expressly states that the mouthpiece assembly may be biased by more than one bias, the recitations in claim 1 of the '028 Patent of "the mouthpiece assembly is biased to the dispensing configuration" and "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" makes it unclear what bias (internal bias, external bias, either internal bias or external bias, or both internal bias and external bias) is being referred to by the recitation of "its bias."

51.    Because the specification of the '595 Patent expressly states that the mouthpiece assembly may be biased by more than one bias, the recitations in claims 14 and 26 of the '595 Patent of "the mouthpiece assembly is biased to the dispensing configuration" and "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" makes it unclear what bias (internal bias, external bias, either internal bias or external bias, or both internal bias and external bias) is being referred to by the recitation of "its bias."

52.    Because the specification of the '879 Patent expressly states that the mouthpiece assembly may be biased by more than one bias, the recitations in claim 1 of the '879 Patent of "the mouthpiece assembly is biased to the dispensing configuration" and "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" makes it unclear what bias (internal bias, external bias, either internal bias or external bias, or both internal bias and external bias) is being referred to by the recitation of "its bias."

53.    It therefore is my opinion that the scope of the claim term "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" in these claims was not reasonably certain to a person of ordinary skill in the art in January 2009 or at any time since and that claim 1 of the '028 Patent, claims 14 and 26 of the '595 Patent, and claim 1 of the '879 Patent are indefinite as a result.

**Claim Phrase: "the resilient mouthpiece is more resilient than the drink spout"**

54.    Claim 1 of the '911 Patent recites the claim phrase: "the resilient mouthpiece is more resilient than the drink spout."

55.    It is my opinion that the scope of the claim phrase "more resilient" was not reasonably certain to a person of ordinary skill in the art in April 2005 or at any time since.

56.    From my review of the specification and prosecution history of the '911 Patent, it is my opinion that the specification and prosecution history does not provide an objective standard for determining the scope of "more resilient."

57.    The claim phrase "more resilient" is not included in the specification of the '911 Patent.  The "more resilient" claim phrase was added to claim 1 in an Amendment and Response to Office Action filed on April 18, 2016, but the "more resilient" claim phrase is not discussed in the "Remarks" section of the Amendment and Response to Office Action.

58.    In the specification of the '911 Patent, the resiliency of the mouthpiece is described in the context of the mouthpiece being able to return to its closed or sealed configuration when compression forces from the user's teeth or mouth are not longer applied to the mouthpiece:

> Mouthpiece 72 is resilient and biased to its closed configuration, such as is shown in FIGS. 10-15. In use, the mouthpiece is adapted to be configured to the dispensing configuration by a user placing the mouthpiece in the user's mouth and biting upon or otherwise compressing the appropriate portions of sidewalls 92 of the

14

mouthpiece, such as bite regions 112, to deform the mouthpiece to a position where the slit or other opening is no longer sealed and instead defines a fluid pathway through which drink fluid may flow. This is somewhat schematically depicted in FIG. 16 with another illustrative example of a suitable bite-actuated mouthpiece. As shown, the opposed lips, or sealing surfaces, 94 that define slit 88 are spread apart from each other to define opening 86, through which drink fluid may be dispensed from the drink bottle. Mouthpiece 72 may be referred to as a self-sealing valve, or valve assembly, because the mouthpiece is constructed to automatically return to its closed, or sealed, configuration when the compressive forces, such as may be applied by a user's teeth or mouth, are no longer applied to maintain the mouthpiece in its dispensing configuration. Therefore, unless forces are being exerted to the mouthpiece to deform the mouthpiece to a dispensing configuration, the mouthpiece will be in its closed, or sealed, configuration.

'911 Patent at col. 8, lines 44-67.

59.   That description in the '911 Patent of resiliency is consistent with the dictionary definitions of "resilient" provided by Zak as "returning freely to a previous position, shape, or condition," "moving swiftly back," and "capable of withstanding shock without permanent deformation or rupture."

60.   However, an understanding of the meaning of the word "resilient" with respect to the mouthpiece does not make the meaning of the claim phrase "the resilient mouthpiece is more resilient than the drink spout" reasonably certain.  That is because the claim phrase is subject to multiple plausible meanings.

61.   First, "the resilient mouthpiece is more resilient than the drink spout" could mean that the mouthpiece springs back or returns to its previous position or shape after being compressed faster than the drink spout.  Second, "the resilient mouthpiece is more resilient than the drink spout" could mean that the mouthpiece springs back or returns to its previous position or shape without damage after being compressed to a greater extent than the drink spout.  Third, "the resilient mouthpiece is more resilient than the drink spout" could mean that the mouthpiece can be compressed for a longer period of time and still spring back or return to its previous

position or shape without damage compared to the drink spout.  Fourth, "the resilient mouthpiece is more resilient than the drink spout" could mean that the mouthpiece can be compressed and decompressed more times than the drink spout and still spring back or return to its previous position or shape without damage.

62.     All of these meanings of the claim phrase "the resilient mouthpiece is more resilient than the drink spout" are plausible.

63.     Because the specification and prosecution history of the '911 Patent do not provide a objective standard for determining the scope of the claim phrase "the resilient mouthpiece is more resilient than the drink spout," it is my opinion that the scope of the claim phrase "the resilient mouthpiece is more resilient than the drink spout" was not reasonably certain to a person of ordinary skill in the art  in April 2005 or at any time since and that claim 1 of the '911 Patent is indefinite as a result.

Submitted on October 10, 2022 by:

John H. Hamilton, MSME PE

## EXHIBIT A

## John H. Hamilton, MSME PE

17252 N Highway 215
Mountainburg, AR 72946
479-790-6782 * 479-369-0326 Fax
Jhh@jhengineer.com

Since 2002, Instructor in the University of Arkansas at Fayetteville Mechanical Engineering Department. Previously, worked as a full-time consulting engineer assisting professionals in both industry and the legal community. Has worked in industry as a manufacturing and plant engineer and has been responsible for the safety of an industrial plant with over 300 employees. Provides consulting to industries, individuals, and attorneys in a wide range of safety and machine design issues such as machine guarding. Examples include agricultural and industrial machine guarding cases, and agricultural and industrial safety systems.

**Education**

MSME 1997, University of Arkansas, Fayetteville, Study in Thermal Systems

BSME 1990, University of Arkansas, Fayetteville

**Professional Engineer License**

Licensed Professional Engineer registered in Arkansas

**Previous Work Experience**

*Senior Engineer, Ryan Engineering, Inc.,* Siloam Springs, Arkansas, 1998-2002. Duties included industrial consulting and serving as an expert witness on product liability cases involving such things as, safe design of products, industrial safety, and machine guarding.

*Instructor, John Brown University*, Siloam Springs, Arkansas, 1996-1998. Taught undergraduate Science and Engineering classes.

*Instructor, University of Arkansas*, Fayetteville, Arkansas, Summer 1996, Summer 1997, Fall 1999. Taught undergraduate Thermodynamics classes.

*Graduate Teaching Assistant, University of Arkansas*, Fayetteville, Arkansas, 1994-1996. Responsible for helping undergraduate students learn basic engineering principles.

*Independent Consultant, Fayetteville, Arkansas*, 1994-1998. Various consulting projects included performing energy analysis on infrared space heaters to completing federally required hazardous material emissions reports.

*Plant Engineer, FM Corporation*, Rogers, Arkansas, Nov 1991-1994, Summer 1997. Responsibilities included facility and equipment upgrades and revisions and plant-wide compliance with safety and environmental regulations.

*Manufacturing Engineer, FM Corporation*, Rogers, Arkansas, Jan-Nov 1991. Responsibilities included designing and improving manufacturing processes and communicating with customers as needed.

**Engineering & Design Experience**

Developed process sheets for molding, assembly, and finishing of plastic parts
Designed and oversaw completion of a chilled water system
Upgraded structural foam (injection molding) machines to use PLCs and modern hydraulic technology
Designed guarding for molding and machine tools
Designed mezzanine
Designed stairs
Designed guard rails
Assisted in performing thermal analysis of wood-burning furnace
Developed testing procedure to establish efficiency of infrared heaters
Designed and built machines to rework plastic parts
Designed various jigs and fixtures to aid in production of plastic parts, which included drilling, cutting, welding, inserting, etc.
Implemented OSHA standards in an industrial facility
Designed elutriator for cyclone dust collector

**Courses Taught and Academic Experience**

| | |
|---|---|
| Thermodynamics I and II | College Physics I and II |
| Engineering Design I | Materials Science |
| Machine Design | Physical Science |
| Fluid Mechanics | Dynamics |
| Technology and Society | Mechanical Systems for Buildings |
| Mechanical Engineering Lab I | Mechanical Engineering Lab II |
| Mechanical Engineering Lab III | Industrial Waste & Energy Management |
| Heat Transfer | |

Created and teach Design for Safety, a senior level mechanical engineering elective, which covers safety topics such as hazard evaluation and mitigation, warnings design, and machine guarding.

Serves as mentor for senior design projects involving industrial applications.

Researched feasibility of two-phase effervescent fluid atomization of a liquid by means of a liquid chemical reaction for the purpose of hypersonic air travel.

Researched the effect of molecular mass of an atomizing gas in effervescent atomization applications.

**Publications**

"Two-Phase Effervescent Atomization Via a Liquid-Liquid Chemical Reaction," *University of Arkansas Press*, 1997

18

"Hazard Analysis," *Plant Engineering*, December 2002
"It Won't Happen to Me: Safe Machine Guarding Practices and Guidelines" *Workplace Safety &HR*, May 2012

**Continuing Education**

Occupational Safety and Health Administration Guide to Voluntary Compliance
Accident Reconstruction
Manufacturer Training of Programming Various PLCs
Various seminars on Environmental Compliance

**Professional Organizations**

Member, American Society of Mechanical Engineers (ASME)

Member, American Society for Engineering Education (ASEE)

## **EXHIBIT B**

1. *Chris Pugh v Precision Air Convey Corporation,* Commonwealth of Kentucky Jefferson Circuit Court, Division Seven, Trial testimony, August 16, 2018;
2. *Dougherty v. Fraker Investment LLC et al.,* Circuit Court of Lawrence County Missouri, Deposition testimony, January 11, 2019;
3. *Snyder v. Ozark Electric et al.,* Circuit Court of Benton County Arkansas, Deposition testimony, July 28, 2020;
4. *Tyler Montgomery v. R.G. Egan Equipment Corporation et al.,* U.S. District Court for the Western District of Oklahoma, Deposition testimony, January 15, 2021;
5. *Cantone v. Gabler Thermoform GMBH & CO*, U.S. District Court for the Northern District of Illinois, Eastern Division, Deposition testimony, May 6, 2022.

**EXHIBIT C**

# Webster's Third New International Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

*A Merriam-Webster*

REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

PHILIP BABCOCK GOVE, Ph.D.

AND

THE MERRIAM-WEBSTER

EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

ters to the legislature ⟨a colonial government⟩

**semi·rigid** \"+\ *adj* [*semi-* + *rigid*] **1** : rigid to some degree or in some parts **2** *of an airship* : having a flexible cylindrical gas container with an attached stiffening keel that carries the load