**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**CAMELBAK PRODUCTS, LLC**                                         **PLAINTIFF**

**v.**                               **CASE NO. 5:21-cv-05109-TLB**

**ZAK DESIGNS, INC.**                                              **DEFENDANT**

<u>**ZAK DESIGNS, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**</u>

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................................1

II.  LEGAL STANDARD ..................................................................................................1

III. EXPERT TESTIMONY OF JOHN H. HAMILTON ................................................2

IV.  DISPUTED CONSTRUCTIONS ...............................................................................3

     A.     "rigid" ........................................................................................................4

     B.     "the anchor portion is sized to restrict passage of the anchor portion through the through passage" ...............................................................................7

     C.     "the resilient mouthpiece is more resilient than the drink spout"................10

     D.     "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" ...........................................13

     E.     "user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism"................17

     F.     "automatically"..........................................................................................19

     G.     "mouthpiece assembly" .............................................................................20

     H.     "air return assembly".................................................................................21

     I.     "stowing region".......................................................................................22

     J.     "user engagement pad … which extends through the sidewall of the base of the cap assembly" / "user engagement pad that extends through a wall of the cap assembly" / "user engagement pad extends through a wall of the cap assembly".......................23

V.   CONCLUSION ..........................................................................................................25

## I.     INTRODUCTION

Plaintiff CamelBak Products, LLC ("CamelBak") largely seeks to avoid claim construction for the disputed claim terms by refusing to even offer proposed constructions for most of them.  By arguing that the Court should give the disputed terms their plain and ordinary meaning with nothing more, CamelBak seeks to leave the question of claim scope unanswered and for the jury to decide.  But that is not permitted under Federal Circuit precedent.  CamelBak also ignores the description and figures in the patents and seeks to distance itself from its successful arguments to the U.S. Patent and Trademark Office in order to obtain the patents in the first place.  But those key pieces of evidence must be considered, and they support Zak's proposed constructions.  The intrinsic and extrinsic evidence also clearly establish that three of the disputed claim terms are indefinite because the scope of the claim terms was not reasonably certain to a person of ordinary skill in the art.  The Court therefore should adopt Zak's claim construction proposals for each of the disputed claim terms discussed below.

## II.    LEGAL STANDARD

Construing a patent is a question of law for the court.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  The words of a patent claim are generally given their ordinary and customary meaning, which is the meaning that the words would have to a person of ordinary skill in the art in question at the time the patent application was filed. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).[1]  The description of the invention in the patent (also referred to as the specification) "is always highly relevant to the claim construction analysis." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  In addition, a court "should also consider the patent's prosecution history…."  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir.

---

[1] Claim construction is an issue unique to patent law, so Federal Circuit law governs.  *See e.g. FlexFoot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1365 (Fed. Cir. 2001)(providing that the law of the Federal Circuit applies "to both substantive and procedural issues intimately involved in the substance and enforcement of the patent right").

1995), *aff'd* 517 U.S. 370 (1996). The prosecution history "consists of the complete record of the proceedings" before the Patent Office, which "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317. The district court may also consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.

The Patent Act requires that a patent "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. ¶ 112, ¶2. This requires "that a patent's claim, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). A "patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (quotations and citations omitted). "Otherwise, there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." *Id.* (quotations and citations omitted). Indefiniteness must be proven by clear and convincing evidence. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015).

## III.   EXPERT TESTIMONY OF JOHN H. HAMILTON

Zak relies on the expert analysis and testimony of John H. Hamilton, PE, to establish that three claim terms in the Patents-in-Suit are indefinite. Ex. A, Declaration of John H. Hamilton ("Hamilton Dec.). Mr. Hamilton received a Bachelor of Science degree and a Master of Science degree in mechanical engineering from the University of Arkansas, and he has been an Instructor in the Mechanical Engineering Department at the University of Arkansas since 2002. Ex. A, Hamilton Dec. at ¶¶5-6. Mr. Hamilton has taught a variety of mechanical engineering courses relevant to the

subject matter in this case, including Materials Science and the Mechanics of Materials, and Mr.

Hamilton is a licensed Professional Engineer in the State of Arkansas.  Ex. A, Hamilton Dec. at ¶¶5,

7.  Before entering academia, Mr. Hamilton worked approximately four years for a plastics

manufacturer as a manufacturing engineer and a plant engineer where he gained extensive

experience and knowledge of plastics processing and assembly of plastic parts.  Ex. A, Hamilton

Dec. at ¶8.  Based on his education and industry work experience, Mr. Hamilton is a person of

ordinary skill in the art.  Ex. A, Hamilton Dec. at ¶13.

## IV.   DISPUTED CONSTRUCTIONS

In the parties' Joint Claim Construction and Prehearing Statement (Doc. 63), the parties

identified the ten claim terms in the six asserted patents that are most significant to the resolution of

the case.  Since that filing, the parties have agreed to the construction of one of the claim terms:

"fluid conduit."  The remaining nine claim terms that were identified as most significant are

discussed below.[2]  As an initial matter, CamelBak argues that the Court should rule that the eight

terms identified by Zak as needing construction should be given their "plain and ordinary meaning,"

but the question of claim scope cannot be left to the jury.  *Eon Corp. IP Holdings v. Silver Springs

Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016)(holding that, "[b]y determining only that the terms

should be given their plain and ordinary meaning, the court left this question of claim scope

unanswered, leaving it for the jury to decide" and "[t]his was legal error").  And CamelBak's

arguments that the claim terms are entitled to broader scope than disclosed in the patents should

also be rejected:

---

[2] The Court indicated to the parties that it intended to construe the ten most significant terms following the claim construction hearing and that briefing should focus on those terms because the default is that only ten terms would be construed in this initial phase.  Zak notes that disputes about the scope of additional claim terms (Term Nos. 1, 4, 10-11, 14, 18-22 in Doc. 63-2) exist.  Zak reserves its right to seek the Court's constructions of these remaining terms if needed after the Court's Order on the initial phase of disputed terms briefed herein.

I understand how a perfectly competent trial judge can be persuaded by the siren song of litigation counsel to give the jury wide scope regarding what is claimed. But it is a song to which courts should turn a deaf ear if patents are to serve the purposes for which they exist, including the obligation to make full disclosure of what is actually invented, and to claims that and nothing more.

*Retractable Tech., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1311 (Fed. Cir. 2011) (Plager, J., concurring). Accordingly, Zak requests that the Court construe the following claim terms as explained below.

A.    **"rigid"**

The claim term "rigid collar member" recited in the claims of the '028 Patent, '595 Patent, '879 Patent, and '833 Patent is indefinite. The patents explain: "In some embodiments, the collar member may be rigid or at least semi-rigid." *See, e.g.*, Doc. 2-2, '028 Patent at 7:46-48. Based on the distinction made between "rigid" and "semi-rigid" in the patents, the meaning of "rigid" must exclude "semi-rigid." *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1359 (Fed. Cir. 2006)("Even interpreting the specification language to permit semi-rigid material elsewhere, the language in claim 1 requires that the heel seat portion of the orthotic device to be 'rigid,'" so "the plaintiff surrendered coverage of orthotic devices with semi-rigid heel seats").

While "terms of degree are not inherently indefinite, such terms must have reasonably ascertainable objective boundaries to a person skilled in the art when read in the context of the invention." *Artic Cat Inc. v. Bombardier Recreational Products Inc.*, 2016 WL 6832623 at *14 (D. Minn. Nov. 18, 2016) (citing *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014)) (internal quotations omitted). In *Artic Cat*, the issue was whether the claim terms "normal operating conditions" and "low temperature operating conditions" were indefinite. *Artic* Cat, 2016 WL 6832623 at *14. Because the patent-in-suit "does not provide any objective boundaries for determining what constitutes 'normal' or 'low temperature' operating conditions," the district court

found that the terms were indefinite as failing to inform those skilled in the art about the scope of the patent-in-suit with reasonably certainty. *Id.* at *15.

Here, like in *Artic Cat*, the patents do not provide an objective standard to determine if a collar member is rigid, semi-rigid, or other than rigid or semi-rigid. Ex. A, Hamilton Dec. at ¶¶23, 25. There are no definitions in the patents for "rigid" or "semi-rigid." Ex. A, Hamilton Dec. at ¶25. In addition, there are no functional standards to use to determine when the collar member is rigid, semi-rigid, or other than rigid or semi-rigid. Ex. A, Hamilton Dec. at ¶26. Because of the lack of an objective standard, Mr. Hamilton opined that the claim term "rigid" was not reasonably certain to him as a person of ordinary skill in the art in January 2009 (i.e., the priority date for the patents). Ex. A, Hamilton Dec. at ¶29.

CamelBak argues that "the claimed 'rigid collar member' has sufficient rigidity, or stiffness, to engage and crimp a resiliently-deformable tube so as to restrict the flow of drink liquid through the tube when the mouthpiece assembly is in a stowed configuration." Doc. 64 at 10.[3] But CamelBak's functional standard does not distinguish between "rigid" (recited in the claims) and "semi-rigid" (recited in the specification but not recited in the claims). The patents explain that the collar member—whether rigid or semi-rigid—engages and crimps the tube to restrict the flow of the drink liquid. Doc. 2-2, '028 Patent at 7:44-8:8. In the same paragraph of the patents that describes that the collar member may be rigid or at least semi-rigid, the patent describes that the "crimping portion 66 of the cap assembly may be defined by at least a portion of the collar member." Doc. 2-2, '028 Patent at 7:59-61. And the crimping portion 66 is "adapted to engage and crimp the crimping region to prevent, or at least restrict, the flow of drink liquid through the liquid passage when the mouthpiece assembly is in the stowed configuration." Doc. 2-2, '028 Patent at 7:9-14. Because the collar member is described as having the ability to "engage and crimp" regardless of

---

[3] The page numbers refer to the page numbers in the header of CamelBak's Brief.

whether the collar member is "rigid" or "semi-rigid," CamelBak's functional definition cannot inform a person of ordinary skill in the art when a collar member is rigid versus semi-rigid.

CamelBak cites "copolyester polymer and other polycarbonates, and metal, such as aluminum" as being "rigid" materials, but the patents describe these materials as examples of materials that can be used to construct "liquid containers 12," not the collar member. The patents also explain that "[l]iquid containers 12 may be (but are not required to be) rigid or at least semi-rigid …." Doc. 2-2, '028 Patent at 3:27-41. Thus, this description in the patents of materials that can be used to make a liquid container that is rigid or semi-rigid does not provide any clarity to a person of ordinary skill in the art how to determine if a collar member is rigid versus semi-rigid.[4]

CamelBak cites *Schoenhaus v. Genesco, Inc.*, 351 F.Supp.2d 320 (E.D. Pa. 2005), in support of its argument that "rigid" is not indefinite, but indefiniteness is patent-specific and indefiniteness was not even presented to the district court in that case. *Id.* at 324-25. However, indefiniteness was raised with respect to the word "rigid" in *Copan Italia S.P.A. v. Puritan Medical Products Company LLC*, 2019 WL 5699078 (D. Me. Nov. 4, 2019). In that case, the patents related to "a flocked swab device and a method for using flocked swabs to collect, transport, and release biological specimen samples for analysis." *Id.* at *1. The claims in the patents recited "said rod tip is rigid," and the court found that "rigid" was not indefinite because a "person of ordinary skill reading the term in the context of the patents-in-suit would understand that the swab needs to be rigid enough to perform the claimed method of collecting liquid samples." *Id.* at *8. The Federal Circuit in *Bionx Implants, Inc. v. Linvatec Corp.*, 299 F.3d 1378, 1380 (Fed. Cir. 2002) affirmed a claim construction of the word "rigid" in a

---

[4] CamelBak also argues that Zak's indefiniteness argument is undermined because Zak and its expert in an *inter partes* review (IPR) proceeding before the U.S. Patent and Trademark Office did not argue that "rigid" was indefinite, but indefiniteness is not a permitted ground of invalidity in an IPR proceeding. *Samsung Electronics America, Inc. v. Prisua Engineering Corp.*, 948 F.3d 1342, 1350 (Fed. Cir. 2020). "[A]lternative pleading before a district court is common practice, especially where it concerns issues outside the scope of *inter partes* review." *Target Corp. v. Proxicom Wireless, LLC*, 2020 WL 6694374 at *5 (PTAB Nov. 10, 2020).

patent for a surgical fastener as "rigid enough 'to be pushed directly through the semi-hard cartilage of a meniscus without any precutting.'" *Id.*

Here, however, a functional definition of "rigid collar member" such as "rigid enough to …" like in *Copan Italia* and *Bionx Implants* and like CamelBak proposes cannot save the "rigid collar member" from indefiniteness because the patents do not distinguish the function of the collar member when it is "rigid" versus when it is "semi-rigid." For all of these reasons, the Court should find the claim term "rigid collar member" indefinite.

**B.    "the anchor portion is sized to restrict passage of the anchor portion through the through passage"**

The parties dispute the meaning of the claim phrase "the anchor portion is sized to restrict passage of the anchor portion through the through passage," which is recited in the claims of the '028 Patent, '595 Patent, and '879 Patent. After the Patent Office rejected the claims of the patent application that resulted in the '028 Patent, CamelBak argued on appeal that this was the novel feature in the '028 Patent. The Patent Trial and Appeal Board (PTAB) agreed and adopted CamelBak's explanation of the meaning of this claim phrase. But now CamelBak seeks to abandon its successful arguments to the PTAB by ignoring them in its brief. But the prosecution history must be considered. *Markman*, 52 F.3d at 980. And the prosecution history dictates that this claim phrase be construed as "the anchor portion is sized such that at least a part of the anchor portion is too large to fit into the through-passage and no part of the anchor portion may pass into one end of the through-passage and out of the opposite end of the through-passage."

On appeal to the PTAB, CamelBak argued: "The Examiner's position appears to be that anything with a size may restrict a passage. Appellants disagree with this broad conclusion, because something that is sized and shaped smaller than a through-passage obviously will not restrict passage therethrough….For these additional reasons, the rejection of independent claims 1, 18, and 21 is

improper and should be reversed." Ex. B, Reply Brief at 3. In reversing the rejection, the PTAB

stated:

> We agree with Appellants. The "sized to restrict" language of claims 1 and 21 is not a statement of intended use. To the contrary, this language positively limits the structure of the claims to a structure in which an anchor portion has a size that functionally acts to restrict, or limit, passage of the anchor portion through the claimed through-passage. Accordingly, the Examiner's finding that an anchor portion with *any size* is capable of restricting passage is unreasonable. Every structure has *a size*, but not all structures are capable of performing the claimed functional requirement of restricting passage of the anchor portion through the through-passage of the base of the cap assembly. As Appellants correctly note, for example, an anchor portion that is *smaller* than the through-passage will not function to restrict passage therethrough.

> In this case, the Examiner provides insufficient findings regarding the relative sizes of Choi's "anchor portion" 182 and through-passage 104 from which we could find that element 182 is sized to restrict passage through opening 104. Choi does not discuss the relative sizing or the claimed functional requirement.

Ex. C, Decision at 5-6 (emphasis in original; internal citations omitted).

CamelBak is bound by its successful arguments to the PTAB. "The prosecution history

constitutes a public record of the patentee's representations concerning the scope and meaning of

the claims, and competitors are entitled to rely on those representations when ascertaining the

degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt,*

*Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000). The PTAB accepted CamelBak's

arguments that the relative size of the anchor portion

and the through-passage is essential to the meaning

of this claim phrase. For the same reasons that "an

anchor portion that is *smaller* than the through-

passage will not function to restrict passage

therethrough," the anchor portion must be sized such



that at least a part of the anchor portion is too large to fit into the through-passage in order to

restrict passage therethrough. This is also described and illustrated in the patents, such as in Fig. 12

8

above with the through-passage colored yellow and the anchor colored purple.  Doc. 2-2, '028

Patent at 5:11-14; 9:39-42; 10:44-55; Figs. 1-6, 12-13.

The "restrict passage of the anchor portion through the through-passage" language is also

included in claim 18 of the '028 Patent, which was also discussed in detail on appeal.  The discussion

of the claim phrase in claim 18 impacts the meaning of the same phrase in the other claims of the

'028 patent and the claims in the related patents because "we presume, unless otherwise compelled,

that the same claim term in the same patent or related patents carries the same construed meaning."

*Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003).

Claim 18 recites "an anchor portion … including a plurality of flanges that are sized and

shaped to provide a friction-fit arrangement with the through-passage and to restrict passage of the

anchor portion through the through-passage of the base of the cap assembly."  CamelBak argued

that a prior art patent called Lin did not disclose this feature.  Specifically, CamelBak argued that

"the flanges 512 of Lin cannot fairly be interpreted as comprising an anchor … [whose] flanges 'are

sized and shaped to provide a friction-fit arrangement with the through-passage and to restrict

passage of the anchor portion through the through-passage of the base of the cap assembly"

because the lower of Lin's two flanges "is disclosed as being configured to permit passage of the

lower flange through the through hole 35 so that the two flanges fit on either side of the through

hole."  Ex. D, Appeal Brief at 28.  In reversing the rejection of claim 18, the PTAB stated:

> We agree with Appellants.  As discussed above, Choi does not disclose an anchor
> portion as claimed.  Lin does not remedy this defect because, although Lin teaches a
> plurality of flanges, Lin does not teach flanges that restrict passage of an anchor
> portion through a through-passage.  Indeed, Lin's lower flange is expressly configured
> to *permit* passage through the through-passage.

Ex. C, Decision at 8 (emphasis in original; citation omitted).

CamelBak again is bound by its successful arguments to the PTAB.  *See Hockerson-Halberstadt*,

222 F.3d at 957.  The PTAB accepted CamelBak's arguments that no part of the anchor portion

(such as the lower flange in Lin) may pass into one end of the through-passage and out of the opposite end of the through-passage in order to meet the "restrict passage of the anchor portion through the through-passage" limitation. Accordingly, to give effect to CamelBak's successful arguments on appeal, a proper construction of "the anchor portion is sized to restrict passage of the anchor portion through the through passage" must include "no part of the anchor portion may pass into one end of the through-passage and out of the opposite end of the through-passage." Otherwise, CamelBak will be permitted to improperly extend its patent rights to anchors that it expressly excluded from the scope of its claim during prosecution.

For all of these reasons, the Court should construe "the anchor portion is sized to restrict passage of the anchor portion through the through passage" as "the anchor portion is sized such that at least a part of the anchor portion is too large to fit into the through-passage and no part of the anchor portion may pass into one end of the through-passage and out of the opposite end of the through-passage."

### C. "the resilient mouthpiece is more resilient than the drink spout"

The claim phrase "the resilient mouthpiece is more resilient than the drink spout" in the '911 Patent is indefinite because the scope of "more resilient" was not reasonably certain to a person of ordinary skill in the art in April 2005 (i.e., the priority date for the '911 Patent). Ex. A, Hamilton Dec. at ¶54. The claim phrase "more resilient" is not included in the specification of the '911 Patent and was added by amendment to claim 1 of the patent application that resulted in the '911 Patent in response to a rejection of claim 1. Ex. E, Amendment at 3. But CamelBak did not substantively discuss the addition of the claim phrase in its response to the rejection. *Id.* at 28-31.

In the '911 Patent, the resiliency of the mouthpiece is described in the context of the mouthpiece being able to return to its closed or sealed configuration when compression forces from the user's teeth or mouth are no longer applied to the mouthpiece:

10

Mouthpiece 72 is resilient and biased to its closed configuration, such as is shown in FIGS. 10-15. In use, the mouthpiece is adapted to be configured to the dispensing configuration by a user placing the mouthpiece in the user's mouth and biting upon or otherwise compressing the appropriate portions of sidewalls 92 of the mouthpiece, such as bite regions 112, to deform the mouthpiece to a position where the slit or other opening is no longer sealed and instead defines a fluid pathway through which drink fluid may flow…. Mouthpiece 72 may be referred to as a self-sealing valve, or valve assembly, because the mouthpiece is constructed to automatically return to its closed, or sealed, configuration when the compressive forces, such as may be applied by a user's teeth or mouth, are no longer applied to maintain the mouthpiece in its dispensing configuration. Therefore, unless forces are being exerted to the mouthpiece to deform the mouthpiece to a dispensing configuration, the mouthpiece will be in its closed, or sealed, configuration.

Doc. 2-1, '911 Patent at 8:44-67. This description in the '911 Patent of resiliency is consistent with dictionary definitions of "resilient" as "returning freely to a previous, shape, or condition," "moving swiftly back," and "capable of withstanding shock without permanent deformation or rupture." Ex. A, Hamilton Dec. at ¶58; Ex. F, Webster's Third New International Dictionary (1993). But an understanding of the meaning of the word "resilient" with respect to the mouthpiece does not mean the claim phrase "the resilient mouthpiece is more resilient than the drink spout" is reasonably certain because the '911 Patent does provide an objective standard for determining the scope of "more resilient." Ex. A, Hamilton Dec. at ¶¶ 55, 59.

Mr. Hamilton opined, as a person of ordinary skill in the art, that the claim phrase could mean: (1) the mouthpiece springs back or returns to its previous position or shape after being compressed faster than the drink spout; (2) the mouthpiece springs back or returns to its previous position or shape without damage after being compressed to a greater extent than the drink spout; (3) the mouthpiece can be compressed for a longer period of time and still spring back or return to its previous position or shape compared to the drink spout; or (4) the mouthpiece can be compressed and decompressed more times than the drink spout and still spring back or return to its previous position or shape without damage. Ex. A, Hamilton Dec. at ¶60. Mr. Hamilton also testified that each of these four meanings of the claim phrase are plausible. Ex. A, Hamilton Dec. at

11

¶61.  The scope of the claim phrase therefore was not reasonably certain.  *See Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Limited, Inc.*, 151 F. Supp. 3d 525, 547 (D. N.J. 2015) (finding the claim term "mean particle size" indefinite because the patent-in-suit "provides no information from which to divine, with reasonably certainty, the appropriate measure of 'mean'").  Because the specification and prosecution history of the '911 Patent do not provide an objective standard for the determining the scope of the claim phrase "the resilient mouthpiece is more resilient than the drink spout," the scope of the claim phrase was not reasonably certain in April 2005 and is therefore indefinite.  Ex. A, Hamilton Dec. at ¶62.

        None of CamelBak's rebuttal arguments are persuasive.  CamelBak argues that the drink spout is "non-resilient" (Doc. 64 at 16), but the '911 Patent does not describe the drink spout as lacking resiliency.  The claim phrase "the resilient mouthpiece is more resilient than the drink spout" would be rendered nonsensical if the drink spout had no resiliency.  In addition, CamelBak misrepresents the description of the '911 Patent by stating that the drink spout is "formed of a rigid, or stiff, material, such as polycarbonate or metal."  Doc. 64 at 16.  The excerpt quoted by CamelBak is a description of the materials from which fluid container 12—the bottom portion of the bottle that holds the drink fluid—can be made.  Doc. 2-1, '911 Patent at 4:9-37 ("Fluid container 12 may be formed from ….").  In addition, CamelBak's argument that a person of ordinary skill in the art would know how to compare the resilience of one material to another is unpersuasive because the specification and claims do not specify the material from which the drink spout is made.  Finally, CamelBak criticizes Mr. Hamilton for considering the dictionary definition of resilient instead of resilience, but "resilient" is the word that is used in the claims of the '911 Patent and the two words have the same meaning.  CamelBak therefore has failed to rebut Zak's evidence that the claim phrase "the resilient mouthpiece is more resilient than the drink spout" is indefinite.

**D.** **"release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration"**

The claims of the '028 Patent, '595 Patent, '879 Patent, and '833 Patent recite: "release the mouthpiece assembly to move via <u>its bias</u> from the stowed configuration to the dispensing configuration." (emphasis added). But "its bias" lacks antecedent basis in the claims, which renders the scope of the claim phrase not reasonably certain to a person of ordinary skill in the art. The Court therefore should rule that the claim phrase is indefinite.

"The concept of 'antecedent basis' is a technique that has developed … to aid those who draft patent claims in satisfying the definiteness requirement of 35 U.S.C. § 112, ¶ 2." Janice M. Mueller, *An Introduction to Patent Law*, 63 (2d ed. 2006). The first time a particular element is introduced in a patent claim, it should be preceded by the indefinite article "a" or "an." *Id*. "Thereafter, each time the claims drafter intends to refer back to that same previously introduced element, it is referred to as 'said' element or 'the' element." *Id*. "The lack of antecedent basis signals a potential indefiniteness problem but does not end the inquiry" *Bushnell Hawthorne, LLC v. Cisco Systems, Inc.*, 813 Fed.Appx. 522, 526 (Fed. Cir. 2020). "Whether a claim, despite the lack of explicit antecedent basis, nonetheless has a reasonably ascertainable meaning must be decided in context." *Id.* (citing *Energizer Holdings, Inc. v. Int'l Trade Cmm'n*, 435 F.3d 1366, 1370 (Fed. Cir. 2006) (internal quotations and alterations omitted).

The lack of antecedent basis commonly results in the claim phrase being ruled indefinite for failing the "reasonable certainty" test. In *24/7 Customer, Inc. v. LivePerson, Inc.*, 235 F. Supp. 3d 1102 (N.D. Cal. 2016), the claim term at issue was "said interaction data." *Id.* at 1108. The term lacked antecedent basis, and the claim recited elements containing different variations of the term "data." *Id.* In determining that the claim term was indefinite, the district court found that it was unclear whether the variations of "data" were "equivalents" or "completely different sets of data." *Id.* The

claims at issue in *Illinois Computer Research LLC v. HarperCollins Publishers, Inc.*, 2012 WL 163801 (S.D. N.Y. Jan. 19, 2012), recited a method including the step of "displaying said images responsive to said requests." *Id.* at *8. The claim term "said requests" lacked antecedent basis, and the parties argued "whether the claims provide a sufficient basis for determining what the requests are and who made them …."" *Id.* at *10. The district court noted that "one could interpret the phrase 'said requests' to capture all requests of whatsoever nature …," but "[s]uch an outcome violates the fundamental principle that the claims of the patent are intended to put the world on notice of the exclusionary rights of the patent holder." *Id.* at *11. As a result, the court found that, "[b]ecause there is no way from the face of the claims themselves to determine who is making the request, the claim do in fact fail for indefiniteness." *Id.*

Here, the phrase "its bias" lacks antecedent basis because the claims do not include a recitation of "a bias." In fact, there are no other uses of the word "bias" as a noun in the claims. There is one claim phrase in claim 1 of the '028 Patent, claims 14 and 26 of the '595 Patent, and claim 1 of the '879 Patent that relates to the mouthpiece assembly being biased to the dispensing configuration that precedes the "its bias" claim phrase at issue. In particular, the claims recite: "the mouthpiece assembly is biased to the dispensing configuration." *See, e.g.,* Doc. 2-2, '028 Patent at 21:45-46. The claim language does not specify how the mouthpiece assembly is biased to the dispensing configuration, but the patents describe at least three ways:

> Mouthpiece assemblies 18 according to the present disclosure are biased toward the dispensing configuration and therefore may be described as having a biasing mechanism 50. The bias of a mouthpiece assembly according to the present disclosure may be provided by the internal bias created by the material from which at least a portion of the mouthpiece assembly is constructed. For example, at least a portion of a mouthpiece assembly, such as crimping region 44, may be constructed of a resiliently deformable material. An illustrative, non-exclusive example of a suitable resiliently deformable material includes (but is not limited to) silicone. Additionally or alternatively, a biasing mechanism 50 may include at least one spring. Other configurations are also within the scope of the present disclosure.

Doc. 2-2, '028 Patent at 5:52-65.

14

This description expressly states that the mouthpiece may be biased toward the dispensing configuration in at least three ways: (1) an internal bias created by the material from which the mouthpiece assembly is constructed; (2) an external bias that includes at least one spring; or (3) an internal bias <u>and</u> an external bias.  *Id.*; Ex. A, Hamilton Dec. at ¶¶36, 47.  Because the patents expressly state that the mouthpiece assembly may be biased by more than one bias (i.e., internal, external, or both), it is unclear what bias is being referred to by the recitation of "its bias" and whether the "mouthpiece assembly is biased to the dispensing configuration" by the same bias that is referred to as "its bias" or a completely different bias.  Ex. A, Hamilton Dec. at ¶¶39, 49-51.  Stated differently, because there is no antecedent basis, it is unclear whether "its bias" refers back to a feature already recited in the claims or whether it refers to an internal bias of the mouthpiece that is being introduced for the first time in the claim.  Because CamelBak chose not to use standard claim drafting language, such as "a bias" or "the bias," it is impossible to know.  Without antecedent basis, the meaning of the claim phrases were not reasonably certain to a person of ordinary skill in the art in January 2009 or at any time since. Ex. A, Hamilton Dec. at ¶52.  Thus, "its bias" is indefinite just like "said interaction data" in *24/7 Customer* and "said requests" in *Illinois Computer Research*.

CamelBak does not contest that there is no express antecedent basis for "its bias" in the '028 Patent, '595 Patent, and '879 Patent.  Instead, CamelBak argues that the phrase "the mouthpiece assembly is biased to the dispensing configuration" discussed above provides <u>implied</u> antecedent basis for the later recitation of "its bias."  But, as explained above, the patents describe that the mouthpiece assembly can be biased in three ways.  Only the mouthpiece assembly having an internal bias created by the material from which the mouthpiece is constructed is described in the patents as the mouthpiece assembly possessing a "bias."  Thus, to accept CamelBak's argument that the claim phrase "the mouthpiece assembly is biased to the dispensing configuration" provides

antecedent basis for "its bias," the Court would have to find that the mouthpiece assembly can only be biased to the dispensing configuration by an internal bias of the mouthpiece assembly.  But, as explained above, that is inconsistent with the description in the patents of three different biases. The Court therefore should rule that "its bias" in the claims of the '028 Patent, '595 Patent, and '879 Patent is indefinite.

The same indefiniteness issue is present in the '833 Patent.  Claim 1 of the '833 Patent recites the claim phrase: "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration."  The only relevant difference between this claim and the claims of the '028 Patent, '595 Patent, and '879 Patent discussed above is that claim 1 of the '833 Patent also recites "the crimping region [of the tube portion of the mouthpiece assembly] at least partially biases the mouthpiece assembly to the dispensing configuration."  CamelBak relies exclusively on this additional claim language for arguing that the claim language is definite.  In particular, CamelBak argues that, "because a POSITA would understand what (sic) that the term 'its' refers to 'mouthpiece assembly' and that the full term 'its bias' requires only one specific bias as outlined by the claim, a POSITA would therefore understand the scope of the claim, rendering the claim definite."  Doc. 64 at 19.  But that argument disregards that claim 1 of the '833 Patent also includes the claim phrase "the mouthpiece assembly is biased to the dispensing configuration."

As explained above, the patent describes that the mouthpiece assembly can be biased in three ways, and it is unclear whether the "mouthpiece assembly is biased to the dispensing configuration" by the same bias that is referred to as "its bias" or a different bias.  In other words, because there is no antecedent basis, it is unclear whether "its bias" refers back to whatever biased the mouthpiece assembly to the dispensing configuration, refers back to the crimping region of the tube portion, or refers to an internal bias of the mouthpiece that is different from the crimping region that is being introduced for the first time in the claim.  Again, because CamelBak chose to use

"its bias" as opposed to standard claim drafting language, it is impossible to know.  Accordingly, the claim phrases were not reasonably certain to a person of ordinary skill in the art in January 2009 or at any time since.  Ex. A, Hamilton Dec. at ¶40.

For all of these reasons, the Court should find the "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" claim phrases indefinite.

E. **"user release mechanism adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism …"**

This claim phrase must be construed as a means-plus-function claim limitation.[5]  "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶6.  There is a rebuttable presumption that claim terms without the word "means" are not governed by §112, ¶6, but the "presumption against means-plus-function claiming is not strong."  *Egenera, Inc. v. Cisco Systems, Inc.*, 972 F.3d 1367, 1372-73 (Fed. Cir. 2000).  The "presence or absence of the word 'means' does not ultimately control whether §112, ¶6 applies."  *Little Giant Ladder Systems, LLC v. Tricam Industries, Inc.*, 2022 WL 2287048 at *11 (D. Minn. June 24, 2022) (citation omitted).  "Generic terms such as 'mechanism,' 'element,' 'device' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they typically do not connote sufficiently definite structure and therefore may invoke § 112, para. 6."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015) (internal quotations omitted).

---

[5] If the Court finds that the claim phrase "release the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" is indefinite as discussed in Section D. above, the Court need not construe this claim phrase or the term "automatically" discussed in Section F. below.

Here, "user release mechanism" is tantamount to using the "means" because it does not have any structure connotation. And the remaining language—"adapted to automatically disengage the first and second catch structures upon actuation of the user release mechanism…"—is merely functional because it gives no sense of what structure or form the claimed user release mechanism takes and only describes what the user release mechanism does. The Court therefore should find that the "user release mechanism" claim limitation is a means-plus-function term subject to 35 U.S.C. § 112(6).

As a means-plus-function term, the Court must (1) identify the function of the claim term and (2) identify the corresponding structure for the function in the patent. *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). The function of the claim term is: "(1) automatically disengaging the first and second catch structures upon actuation of the user release mechanism; and (2) releasing the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration."[6] Within the function construction, "upon actuation of the user release mechanism" should be construed as "upon engagement and translation of the user engagement pad" based on an express definition of the phrase in the patents. Doc. 2-2, '028 Patent at 12:61-65 ("…cap assembly upon user actuation of the user release mechanism 160 (i.e., upon user engagement and translation of the user engagement pad 240)"); *Skinmedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1200 (Fed. Cir. 2013)("In a specification, a patentee's use of 'i.e.' signals an intent to define the word to which it refers")(citation omitted).

The "structure corresponding to the claimed function must be disclosed in the specification with clear linkage between the structure and the claimed function." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1220 (Fed. Cir. 2003). Based on this standard, the

[6] If the claim phrase "releasing the mouthpiece assembly to move via its bias from the stowed configuration to the dispensing configuration" is not found to be indefinite, the claim phrase will need to be construed by the Court.

18

corresponding structure for the "disengaging" and "releasing" functions described in the patents is a "sliding member having a user engagement pad and actuator."  Doc. 2-2, '028 Patent at 6:29-39; 12:50-67.  The patents explain: "As perhaps best seen in Fig. 11, user release mechanism 160 of drink bottle 100 includes a sliding member 238.  Sliding member 238 includes a user engagement pad and an actuator …."  *Id.* at 12:54-57.  The Court therefore should construe the corresponding structure as a "sliding member having a user engagement pad and actuator, and equivalents thereof."

### F.    "automatically"

CamelBak argued in its brief that "Zak's proposed construction—'without action by the user'—improperly seeks to exclude all human interaction, contrary to the claim language and the specification, which explicitly requires that a user actuate a 'pad.'"  Doc. 64 at 23.  Zak does not believe that the word "additional" is necessary in the construction of "automatically" because other claim language recites the action required by the claim—actuation of the user release mechanism.  Nevertheless, after receiving CamelBak's brief and in an effort to resolve this claim term dispute, Zak offered CamelBak a compromise construction of "without additional action by the user after actuation of the user release mechanism."  CamelBak rejected the compromise, but CamelBak's apparent position is inconsistent with its arguments made in its brief.  CamelBak underlined for emphasis three different instances in the patents in which actuation of the user release mechanism is discussed in the same sentence as the term "automatically."  If the word "additional" is included in the construction of "automatically," then the initial action of actuation of the user release mechanism should be included in the construction to avoid confusion as to what user action is required.  Accordingly, Zak submits that the Court should construe the claim term "automatically" as either "without action by the user" or "without additional action by the user after actuation of the user release mechanism."

G.    "mouthpiece assembly"

The "mouthpiece assembly" recited in the claims of the '028 Patent, '595 Patent, '879 Patent, and '833 Patent is "the group of parts or distinct sections that are joined together to allow a user to suck drink liquid." The specification of the '028 Patent describes the mouthpiece assembly as a group of parts that are joined together: "Mouthpiece assembly 118 includes a mouthpiece portion 76 in the form of a bite-actuated mouthpiece 176, a tube 78, and an anchor portion 86." *Id.* at 10:27-30. In one embodiment, the '028 Patent describes that the mouthpiece, tube, and anchor of the mouthpiece assembly are constructed as a unitary assembly. *Id.* at 10:56-59. The mouthpiece assembly being a group of parts (i.e., mouthpiece, tube, and anchor) or distinct sections (i.e., mouthpiece portion, tube portion, and anchor portion) that are joined together is also illustrated in the figures, such as Fig. 6 shown above.



CamelBak does not argue that Zak's proposed construction for "assembly" is incorrect. That is because Zak's proposed construction is consistent with the specification and the figures of the '028 patent and the dictionary definition of "assembly," and also because CamelBak's own expert, Jim Goldman, testified that the plain and ordinary meaning is "a group of parts joined together to perform a function." Ex. F Webster's Third New International Dictionary (defining "assembly" as "a collection of parts so assembled as to form a complete machine, structure, or unit of a machine"); Ex. G, Goldman Dep. at 32:5-10 (Vol. I).

CamelBak argues that the "to allow a user to suck drink liquid" language in the proposed construction improperly limits the mouthpiece assembly to only one embodiment wherein the user is able to suck drink liquid." Doc. 64 at 12-13. But CamelBak does not support that argument with any evidence from '028 Patent. Instead, CamelBak cites the '911 Patent—a completely different

patent in a completely different patent family.  In contrast, the '028 Patent describes: "Mouthpiece assemblies 18 according to the present disclosure define the liquid passage 36, through which drink liquid from the liquid container may be selectively drawn by a user."  Doc. 2-2, '028 Patent at 4:46-49.  Zak therefore requests that the Court adopt its proposed construction of "the group of parts or distinct sections that are joined together to allow a user to suck drink liquid."

H.    **"air return assembly"**

In an effort to reach an agreement on the construction of this claim phrase before claim construction briefing, Zak offered CamelBak a compromise construction of "a group of parts that are joined together as a unit that is adapted to selectively permit air from external the drink container to enter the internal compartment of the fluid container other than through the dispensing outlet of the resilient mouthpiece" for the entire claim phrase.  CamelBak rejected this compromise without explanation.  The parties' dispute therefore centers on whether an "assembly" is a "group of parts that are joined together as a unit."[7]

The '911 Patent describes the air return assembly as including a group of parts that are joined together, such as air conduit 162 and air return valve 168.  Doc. 2-1, '911 Patent at 12:45-13:64; 18:1-11.  The dictionary definition of "assembly" is "a collection of parts so assembled as to form a complete machine, structure, or unit of a machine."  Ex. F, Webster's Third New International Dictionary.  And CamelBak's own expert, Jim Goldman, testified that the plain and ordinary meaning of the word "assembly" is "a group of parts joined together to perform a function."  Ex. G, Goldman Dep. at 32:5-10 (Vol. I).  Accordingly, Zak submits that the Court should construe the entire "air return assembly" claim phrase as "a group of parts that are joined together as a unit that is adapted to selectively permit air  from external the drink container to enter

---

[7] Zak does not object to the entire claim phrase of "air return assembly adapted to selectively permit air …" being construed as requested by CamelBak, although the dispute centers on the meaning of "air return assembly."

21

the internal compartment of the fluid container other than through the dispensing outlet of the resilient mouthpiece."

### I.    "stowing region"

The "stowing region" recited in the claims of the '028 Patent, '595 Patent, and '879 Patent is "the space on the cap assembly that is sized for storing at least a portion of the mouthpiece assembly." CamelBak broadly interpreted "stowing region" in its infringement contentions to be the general area in which the mouthpiece is stowed or stored. But that interpretation is inconsistent with the specification of the '028 patent, which is best understood by referring to the figures. With the mouthpiece assembly 118 in the dispensing configuration, Fig. 9 (above) shows that stowing region 206 is a space on the cap assembly 114. And with the mouthpiece assembly in the stowed configuration, Fig. 10 (right) shows that a portion of the mouthpiece assembly 118 fits in the space on the cap assembly that is marked as the stowing region in Fig. 9. Thus, the stowing region is only that space in which the mouthpiece assembly is stored on the cap assembly. That is also supported by the description in the '028 patent, which states: "Planar portion 242 of sliding member 238 partially defines stowing region 206 together with lateral guards 204 of handle 202."





CamelBak criticizes Zak's proposed construction as including language (sized for storing at least a portion of the mouthpiece assembly) repetitive of claim language that appears elsewhere in the claims, but that does not make the proposed construction inaccurate. Based on the disclosure in the patents, the "stowing region" cannot be divorced from what is stowed or stored there as CamelBak seemingly argues. *See MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1256 (Fed. Cir. 2012)

(recognizing that an "inventor is entitled to claim in a patent what he has invented, but no more");

*Retractable Tech.*, 653 F.3d at 1305 (recognizing that "we strive to capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention").  Zak's proposed construction would also be helpful to the jury in evaluating dependent claims of the patents that refer back to the "stowing region" in the independent claims.  For example, claim 3 of the '879 patent recites: "The drink container of claim 1, wherein the sliding member is configured to slide relative to the base of the cap assembly within <u>the stowing region</u> to selectively disengage the first and second catch structures."  Doc. 2-4, '879 Patent at 22:27-30 (emphasis added).  The Court therefore should construe the claim term "stowing region" as "the space on the cap assembly that is sized for storing at least a portion of the mouthpiece assembly."

> **J.**    **"user engagement pad … which extends through the sidewall of the base of the cap assembly"/ "user engagement pad that extends through a wall of the cap assembly"/ "user engagement pad extends through a wall of the cap assembly"**

These claim phrases in the '028 Patent, '595 Patent, and '833 Patent should be construed as follows: "user engagement pad … which extends from one side to the other side of an opening that is surrounded by the sidewall of the base of the cap assembly," "user engagement pad that extends from one side to the other side of an opening that is surrounded by the sidewall of the base of the cap assembly," and "user engagement pad extends from one side to the other side of an opening that is surrounded by the wall of the cap assembly."  The parties' dispute centers on whether these claim phrases require that the user engagement pad extends through an opening or hole within the perimeter of the wall of the cap assembly and whether "extends through" requires that the user engagement pad extend from one side to the other side of the opening or hole.  The "user engagement pad … extends through" language does not appear in the description in the patents, so

an understanding of the meaning of these claim phrases must be determined by referencing the figures showing the user release mechanism and the user engagement pad.

As best illustrated in the cross-sectional views of Figs. 12-13 of the '028 Patent (see colored Fig. 12 below), the user engagement pad 240 extends through an opening that is surrounded by the sidewall of the base 116 of the cap assembly. These figures show that the base of cap assembly is both above and below the opening through which the engagement pad extends. Figs. 1-4 also schematically show that the user release mechanism 60, of which engagement pad 240 is a part, extending through an opening within the perimeter of cap assembly 14 as indicated by the cap assembly being both above and below the user release mechanism.

CamelBak argues that inclusion of "an opening that is surrounded by the wall of the cap assembly" in Zak's proposed construction is an "improper narrowing requirement." CamelBak argues that the figures of the '028 Patent only illustrate an opening formed by the wall of the cap assembly on the top and the sides. Doc. 64 at 26-27. Specifically, CamelBak argues that in Fig. 11 "the 'floor' of the disclosed opening is formed by the surface on which the 'sliding member' slides—not the 'sidewall' as required by Zak's proposed construction." Doc.



64 at 27. But the "floor" that is colored blue in CamelBak's annotated version of Fig. 11 does not make-up the opening through which the user engagement pad extends. Colored Fig. 12 above, which is a cross-sectional view of the same cap assembly as Fig. 11, shows that the base of the cap assembly (colored red) is both above and below the opening through the user engagement pad (colored purple) extends. Notably, CamelBak's expert, Jim Goldman, even testified that a hole surrounded by the wall of the cap assembly is shown in Fig. 11. Ex. G, Goldman Dep. at 107:15-108:23 (Vol. I). CamelBak's unsupported argument that the user engagement pad extends through

the wall of the cap assembly without there being an opening or hole that is surrounded by the wall of the cap assembly should be rejected.

CamelBak also criticizes Zak's inclusion of "from one side to the other side" in its proposed construction as "improperly changing the plain meaning of the word ["through"]." Doc. 64 at 26. But that is the definition of the word "through," and CamelBak does not offer any alternative understanding of the word or any support for an alternative understanding. CamelBak's unsupported argument about the word "through" therefore should also be rejected.

Fundamentally, "[a]n inventor is entitled to claim in a patent what he has invented, but no more." *MySpace, Inc.*, 672 F.3d at 1256; *Sealant Systems Int'l, Inc. v. TEK Global SRL, Tek*, 616 Fed.Appx. 987, 993 (Fed. Cir. 2015)(rejecting patentee's claim construction for "cooperate with" beyond what is described in the patent because "[t]here is nothing in the patent indicating the patentee conceived of how the hose might 'cooperate with' an inflatable article other than by connecting to it directly …."). The drink container than the inventors invented is described and illustrated in the '028 Patent. CamelBak's only argument that the inventors invented a user engagement pad that does not extend from one side to the other side of an opening that is surrounded by the wall of the cap assembly is based on its incorrect understanding of Fig. 11 and is inconsistent with its own expert. Zak's proposed constructions are consistent with the specification and figures of the patents, and the Court should therefore adopt Zak's proposed constructions.

## V.    CONCLUSION

For all of these reasons, the Court should adopt Zak's claim construction proposals for each of the disputed claim terms discussed in this initial phrase of claim construction.

WRIGHT, LINDSEY & JENNINGS LLP
200 West Capitol Avenue, Suite 2300
Little Rock, Arkansas 72201
(501) 371-0808
FAX: (501) 376-9442
kwilson@wlj.com; bglasgow@wlj.com

By    Richard Blakely Glasgow
      Kyle R. Wilson (89118)
      Richard Blakely Glasgow (2009157)

*Attorneys for Zak Designs, Inc.*